# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
**No. 20-1799V**

* * * * * * * * * * * * * * * * * * * * * * * * *
KARTER HARMON,

Petitioner,

v.

SECRETARY OF HEALTH
AND HUMAN SERVICES,

Respondent.
* * * * * * * * * * * * * * * * * * * * * * * * *

Chief Special Master Corcoran

Filed: July 6, 2026

*Joseph Vuckovich,* mctlaw, Washington, DC, for Petitioner.

*Sarah Rifkin*, U.S. Department of Justice, Washington, DC, Respondent.

**ENTITLEMENT DECISION**[1]

On December 8, 2020, Andrew and Jill Harmon filed a petition seeking compensation under the National Vaccine Injury Compensation Program (the "Vaccine Program")[2] on behalf of their then-minor son, Karter Harmon. The claim alleged that Mr. Harmon experienced Guillain-Barré syndrome ("GBS") as a result of receiving several covered vaccines on January 11, 2018—tetanus-diphtheria-acellular-pertussis ("Tdap"), human papillomavirus ("HPV"), and meningococcal vaccines. Petition (ECF No. 1) at 1. When Mr. Harmon reached the age of majority, he became the proper party in interest, and the case caption was amended to make him the Petitioner. Motion to Amend Caption (ECF No. 34); Order granting Motion (ECF No. 35).

[1] Under Vaccine Rule 18(b), each party has fourteen (14) days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public in its present form. *Id.*

[2] The Vaccine Program comprises Part 2 of the Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3758, codified as amended at 42 U.S.C. §§ 300aa-10 through 34 (2012) ("Vaccine Act" or "the Act"). Individual section references hereafter will be to § 300aa of the Act (but will omit that statutory prefix).

I determined that this matter could be fairly resolved via ruling on the record, and both sides have filed briefs in support of their positions. *See* Petitioner's Memorandum in Support of Motion for Findings of Fact and Conclusions of Law Regarding Entitlement, dated September 20, 2025 (ECF No. 69-1) ("Br."); Respondent's Opposition, dated October 21, 2025 (ECF No. 71) ("Opp."); Petitioner's Reply, dated November 8, 2025 (ECF No. 73) ("Reply"). The matter is now ripe for resolution. For the reasons set forth in more detail below, I hereby deny entitlement. Petitioner has not preponderantly established that any of the covered vaccines he received, alone or in concert, could cause GBS.

## I. Factual Background

Petitioner was 12 years old when he received the three covered vaccines at issue on January 11, 2018. Ex. 1; Ex. 2 at 22–23. All were administered to him during a well-child annual visit with his primary care provider ("PCP"). Ex. 2 at 20. Nothing from Petitioner's pre-vaccination medical history bears on this case, and there is no record of any close-in-time vaccine reaction or post-vaccination malaise.

19 days later (January 30, 2018), Mr. Harmon was taken back to his PCP, and his parents reported a one-week history of headaches and generalized body aches, including pain in his jaw, legs, neck, and shoulder (meaning onset of these symptoms occurred around January 23rd, or less than two weeks after the mid-January vaccinations). Ex. 2 at 29. He denied any fever or exposure to illness, and his physical exam was normal, apart from tenderness in his jaw and hip. *Id*. at 30–31. Petitioner was diagnosed with joint and muscle pain and was advised to rest. *Id*. at 32.

Petitioner saw his PCP again on February 5, 2018, now complaining of lower extremity weakness, a tingling sensation in his legs, and falling when trying to run, plus ongoing headaches and back neck pain. Ex. 2 at 41. Exam now revealed deep tendon reflexes (+1) in all extremities but no other focal deficits. *Id*. at 42–43. His PCP documented muscle weakness, proposed Petitioner might have GBS, and suggested a neurological exam. *Id*. at 44.

That same day, Mr. Harmon was taken to the emergency department ("ED") reporting persistent headaches and "concern for Guillain Barre." Ex. 3 at 7. Providers noted that he had received "immunizations 2 weeks prior" and "then had muscle aches that were intermittent, moving around." *Id*. He was also experiencing headaches associated with vomiting and "ascending numbness and weakness of his lower extremities," and he had been unable to run or jump for the past two days. *Id*.

In his ED exam, Petitioner exhibited reduced strength and numbness in his legs. Ex. 3 at 7. His patellar reflexes were intact, but he displayed an abnormal gait and was unable to run or jump. Id. A lumbar puncture yielded results deemed to be consistent with GBS, and Petitioner was subsequently admitted to the hospital's neurology unit. *Id*.

Mr. Harmon remained an in-patient through February 10, 2018. Ex. 3 at 4. While hospitalized, he was seen by pediatric neurologist Gary Rex Nelson, M.D., who obtained the same general history of symptoms onset and course provided to other treaters. Ex. 3 at 9. Dr. Nelson also noted that Petitioner had "received unknown immunizations 3 weeks ago at his PCP but did NOT receive influenza vaccination this year." *Id.* at 9, 11. Exam revealed moderate strength but absent reflexes and an uneven gait, and Dr. Nelson characterized these findings as "reassuring." *Id.* at 9, 11. But it was proposed that Petitioner receive additional monitoring plus Intravenous immunoglobulin [3]("IVIG") treatment. *Id.* at 11.

After a four-day IVIG course, Mr. Harmon was discharged. Ex. 3 at 4. At this time he continued to display weakness in his hips, absent patellar reflexes, and a slightly uncoordinated gait, but could also walk without assistance, and was not deemed to "meet criteria for inpatient rehab." *Id*. at 4–5. He was instead prescribed gabapentin and nausea medication. *Id*. at 5. On February 12, 2018, Petitioner returned to his PCP for post-hospitalization follow-up care. Ex. 2 at 45. Although he was still experiencing nausea and vomiting, his "muscle weakness seem[ed] to be receding and his numbness and weakness [was] confined more to his ankles." *Id.*

The next day, however (February 13, 2018), Petitioner was taken back to his PCP due to intense headaches plus a tingling sensation around his calves. Ex. 2 at 56. Petitioner's PCP recommended an MRI and a neurological consult. *Id*. at 58. Later that day, Petitioner returned to the ED for treatment of his "increasing[ly] severe constant headache, with nausea, and intermittent vomiting." *Id*. at 68. Providers noted that he "actually had a headache 1 week predating his diagnosis of Guillain-Barr[e]." *Id*. An MRI was normal, and there was "nothing to suggest post LP headache," so additional monitoring was recommended. *Id*. at 67.

On February 14, 2018, Petitioner saw neurologist Seth Kareus, M.D., for outpatient care. Ex. 2 at 63. He again displayed absent reflexes, plus slightly decreased strength in his legs, and could not run but could briefly walk on his toes. *Id*. at 63–64. Dr. Kareus took note of the prior GBS diagnosis, as well as Petitioner's subsequent improvement (which included diminishment of headaches). *Id.* at 65. Physical therapy ("PT") and a short course of steroids was recommended. *Id.*

Petitioner began pediatric PT in the first week of March 2018. Ex. 5 at 124. A medical history provided by his father noted that he had "recently had a vaccine in late January and then became ill with back pain, neck pain, jaw pain and generalized weakness [and] was having difficulty with walking and balance." *Id*. Mr. Harmon had since shown improvement, however,

[3] "Intravenous Immunoglobulin" is defined as "[a] therap[y] prepared from a pool of immunoglobulins (antibodies) from the plasma of thousands of healthy donors. Immunoglobulins are made by the immune system of healthy people for the purpose of fighting infections … IVIG/SCIG work in different ways to prevent the body from attacking itself and to decrease several types of inflammation in the body." *Curry v. Sec'y of Health & Hum. Servs*., No. 22-729V, 2025 WL 1693655, at n.4 (Fed. Cl. Spec. Mstr. Apr. 28, 2025).

although he still had some motor difficulties. *Id*. A therapist recommended a PT program to improve his strength and coordination, and Petitioner attended 22 PT sessions through August 1, 2018. *Id.* at 125; *see also* Ex. 5 at 175–384.

By his final PT visit, Petitioner was reporting that he was able to swim and play lacrosse with no pain. Ex. 5 at 376. He thereafter obtained no more specialized neurologic care associated with his GBS. A year later (August 2019), Petitioner again saw his PCP for an annual wellness check. Ex. 7 at 25. He now exhibited a normal gait, intact deep tendon reflexes, and normal muscle strength. *Id*. at 28. Although Petitioner's mother expressed concerns about future vaccinations, the PCP did not appear to endorse any concerns or recommend that vaccines be avoided. *Id.* at 25–28. There is no subsequent evidence in this record of any more neurologic-associated treatment or concerns for ongoing GBS sequelae.

## II. Expert Reports

### A. *Petitioner's Experts*

1. <u>Dr. Jonathan D. Santoro</u> – Dr. Santoro is a pediatric neurologist, and he prepared two written reports in defense of both the GBS diagnosis and vaccine causation. Report, dated May 27, 2023, filed as Ex. 15 (ECF No. 37-1) ("First Santoro Rep."); Report, dated November 27, 2024, filed as Ex. 71 (ECF No. 60-1) ("Second Santoro Rep.").

Dr. Santoro earned his M.D. at Tulane University, where he had previously obtained his Bachelor's and Master's in neuroscience Curriculum Vitae, dated June 7, 2023, filed as Ex. 16 (ECF No. 37-2) at 1. After graduation, Dr. Santoro underwent his residency at Stanford University School of Medicine where he did a two year rotation in pediatrics and a three year rotation in child neurology. *Id.* He later became the chief resident of the neurology department. *See id.* Dr. Santoro is currently board certified in psychiatry and neurology, and he serves as the Director of Research and Director of Neuroimmunology and Demyelinating Disorders Program for the Children's Hospital of Los Angeles. *Id.* Dr. Santoro has published over eighty peer-reviewed articles and continues to see and treat patients who are suffering from pediatric neuroimmunologic and neuroinflammatory diseases. *Id.* at 2–12; First Santoro Rep. at 2.

*First Report*

Dr. Santoro's first report included an overview of Petitioner's relevant medical history. First Santoro Rep. at 3–7. He noted that Mr. Harmon had likely experienced GBS within 12 to 19 days of his vaccinations, stressing that his clinical workup and testing results were all consistent with that diagnosis. *Id.* at 8. Dr. Santoro characterized GBS as a "rare autoimmune disorder," especially in children like Petitioner, and who more often than not only experience it in the wake of preceding infection. *Id.* In fact, a number of different wild infections were associated with GBS,

suggesting to Dr. Santoro that "particular antigen exposure is less likely to be the cause of this condition but rather the immune systems [sic] dysregulated response to it." *Id*. However, although Dr. Santoro filed eight items of literature to support this point, none involve the wild viral or bacterial cognates of the vaccines at issue. *See generally id.* at 8 (citing M. Lima et al., *Guillain-Barre Syndrome and its Correlation with Dengue, Zika and Chikungunya Viruses Infection Based on a Literature Review of Reported Cases in Brazil*, 197 *Acta Trop.* 1, 3 (2019), filed as Ex. 22 (ECF No. 39-7) (discussing Dengue, Zika and Chikungunya viruses) ("Lima"); M. Yu et al., *Clinical Spectrum and Burden of Influenza-Associated Neurological Complications in Hospitalized Paediatric Patients*, 9 Front Pediatrics 1, 3–5 (2019), filed as Ex. 23 (ECF No. 39-8) (discussing influenza A and influenza B viruses) ("Yu"); A. Jha et al., *Neurological Manifestations of Hepatitis E Virus Infection: An Overview*, 27 World J. Gastroenterology 2090, 2091 (2021), filed as Ex. 25 (ECF No. 39-10) (discussing hepatitis E virus); P. Kennedy & A. Gershon, *Clinical Features of Varicella-Zoster Virus Infection*, 10 Viruses 1, 1 (2018), filed as Ex. 26 (ECF No. 39-11) (addressing varicella-zoster virus); O. Vampertzi et al., *Comorbid Presentation of Syringomyelia and Guillain-Barre Syndrome, Attributed to Mycoplasma, in a 6-year-old Female Patient*, BMJ Case Rep. 1, 2 (2018), filed as Ex. 27 (ECF No. 39-12) (case report of mycoplasma infection); I. Baltadzhiev et al., *Guillain-Barré Syndrome in a Child with Ongoing Viral Hepatitis A*, 12 Iran J. Child Neurol. 133, 133 (2018), filed as Ex. 28 (ECF No. 39-13) (addressing hepatitis A virus).

Vaccines, Dr. Santoro contended, could also likely lead to GBS in some instances. *See generally* First Santoro Rep. at 9–11 (citing W. Yih et al., *An Assessment of the Safety of Adolescent and Adult Tetanus–Diphtheria–Acellular Pertussis (Tdap) Vaccine, Using Active Surveillance for Adverse Events in the Vaccine Safety Datalink*, 27 Vaccine 4257, (2009), filed as Ex. 35 (ECF No. 40-6) ("Yih 2009")). Dr. Santoro did admit that "[m]ultiple studies evaluating state and county level data have not found an association between vaccination and GBS or other demyelinating disorders." First Santoro Rep. at 9 (citing K. Top et al., *Guillain-Barre Syndrome After Immunization in Canadian Children (1996–2012),* 34 Pediatric Infectious Disease J. 1412–13 (2015), filed as Ex. 30 (ECF No. 39-15) ("Top"); R. Hughes et al., *No Association Between Immunization and Guillain-Barre Syndrome in the United Kingdom, 1992 to 2000,* 166 Arch. Intern. Med. 1301, 1303 (2006), filed as Ex. 31 (ECF No. 40-2) ("Hughes"). However, "more narrow vaccine protocols" have uncovered some vaccine associations (although the articles filed in support of this contention reference only the H1N1 flu vaccine). *Id.* (citing P. De Wals et al., *Risk of Guillain-Barre´ Syndrome Following H1N1 Influenza Vaccination in Quebec*, 308 J. Am. Medical Assoc. 175, 180 (July 11, 2012), filed as Ex. 33 (ECF No. 40-4). Dr. Santoro also deemed it a "statistical challenge" generally to measure the risk of GBS as a vaccine-associated adverse event, since GBS is already "a rare disease in a population [pediatric] who nearly ubiquitously receives multiple vaccines" at once. *Id*.

Each of the vaccines Petitioner received have been linked to GBS, Dr. Santoro maintained. But in so contending, Dr. Santoro reiterated his view that it was more the general impact of vaccination (and its capacity to encourage immune dysregulation resulting in an autoimmune condition) that was mechanistically explanatory, rather than any specific vaccine-immune system interaction. To support this aspect of his opinion, Dr. Santoro largely cited passive surveillance data (instances of reported adverse post-vaccination events, as opposed to confirmed cases of GBS). *See, e.g.*, S. Chang et al., *U.S. Postlicensure Safety Surveillance for Adolescent and Adult Tetanus, Diphtheria and Acellular Pertussis Vaccines: 2005–2007*, 31 Vaccine 1447 (2013), filed as Ex. 34 (ECF No. 40-5) ("Chang") (analyzing Vaccine Adverse Event Reporting System[4] ("VAERS") data to assess number and severity of adverse events following Tdap vaccination, and finding no major safely concerns); T. Myers et al., *Adverse Events Following Quadrivalent Meningococcal Diphtheria Toxoid Conjugate Vaccine (Menactra®) Reported to the Vaccine Adverse Event Reporting System (VAERS), 2005–2016*, 38 Vaccine 6291, 6293 (2020), filed as Ex. 36 (ECF No. 40-7) ("Myers 2020") (reviewing VAERS data from 2005 to 2016 for reported events temporally associated with the meningococcal vaccine but finding limited instances of adverse effects, providing reassurance of the vaccine's safety); T. Myers et al., *Adverse Events Following Quadrivalent Meningococcal CRM Conjugate Vaccine (Menveo®) Reported to the Vaccine Adverse Event Reporting System (VAERS), 2010–2015*, 35 Vaccine (2017), filed as Ex. 37 (ECF No. 40-8) ("Myers 2017") (reviewing VAERS data from 2010 to 2015 to assess vaccine safety across different ages and finding no new safety concerns); Y. Hu et al., *Post-licensure Safety Monitoring of Quadrivalent Human Papillomavirus Vaccine Using the National Adverse Event Following Immunization Surveillance System from Zhejiang Province*, *2018-2020*, 17 Hum. Vaccines & Immunotherapeutics 5450–51 (2021), filed as Ex. 38 (ECF No. 40-9) ("Hu") (finding low numbers of HPV vaccine-associated adverse events)**.** Dr. Santoro added that because Petitioner had received all three relevant vaccines at the same time, it was an "exercise in futility" to identify which was the "potential antigenic trigger" for GBS. First Santoro Rep. at 10.

Dr. Santoro's opinion thus departed from the commonly-posited theory (especially in cases involving GBS) of molecular mimicry (in which antigenic similarity between a vaccine's components and self-peptide sequences in a human tissue result in a cross-reactive attack against self by autoantibodies or other immune cells stimulated into production by the presenting foreign vaccine antigens) drives an autoimmune process. First Santoro Rep. at 10. He acknowledged that the "concept of homology" could be important in ensuring a vaccine's effectiveness, and that

[4] The Vaccine Adverse Event Reporting System ("VAERS") is a national warning system designed to detect safety problems in U.S.-licensed vaccines. See About VAERS, VAERS, https://vaers.hhs.gov/about.html (last visited June 8, 2026). It is managed by both the CDC and the FDA. VAERS monitors and analyzes reports of vaccine related injuries and side effects from both healthcare professionals and individuals. But it has been observed in the Program that VAERS data is not particularly probative of causation, unless supplemented with other reliable evidence—since a VAERS report only establishes a temporal, post-vaccination occurrence, and does not independently confirm the reported adverse event either.

molecular mimicry was accepted as explanatory of how certain autoimmune diseases occur. *Id.*[5] But he proposed that it was "clearly not the case" that "certain vaccines would yield only one neurologic/demyelinating phenotype"—and thus demyelinating injuries were sometimes likely attributable to vaccination even in the absence of cross-reactive antibodies produced due to antigenic similarity between host tissues and vaccine components. *Id.* at 10–11. (For support, Dr. Santoro referenced paraneoplastic disease, where tumors that were "clearly dissimilar" to self-tissue, and hence did not include amino acid sequence mimics, could still trigger "a host of neurologic phenotypes." *Id.* at 11).

Dr. Santoro specifically proposed that a key element of a vaccine-induced autoimmune response could arise from a breakdown in immune tolerance (the immune system's self-defense mechanism against both foreign and autoantigens). First Santoro Rep. at 11–12. It is understood by medical science, he argued, that autoimmune processes due to such a breakdown was "strongly associated with exposure to environmental stimuli such as infectious antigens." *Id.* at 11 (citing Y. Shoenfeld et al., *The Mosaic of Autoimmunity: Hormonal and Environmental Factors Involved in Autoimmune Diseases – 2008*, 10 IMAJ 10–11 (Jan. 2008), filed as Ex. 47 (ECF No. 41-3) ("Shoenfeld")). An immune response to a vaccine would be comparable to a wild infection, making it possible for vaccine antigens to similarly induce autoimmunity.

Indirectly supporting this theory, Dr. Santoro maintained, was the fact that "higher quantities and higher heterogeneity of vaccine antigens" were now associated with increased risk of neurologic disease (although he referenced articles involving GBS attributable to the flu vaccine only for this contention). First Santoro Rep. at 12 (citing D. Arya et al., *Surveillance for Guillain-Barré Syndrome After 2015–2016 and 2016–2017 Influenza Vaccination of Medicare Beneficiaries,* 37 Vaccine 6543, 6548 (2019), filed as Ex. 53 (ECF No. 41-9) (using real-time surveillance data to evaluate the association of GBS claims after flu vaccinations); R. Soni et al., *Antigenic Variability a Potential Factor in Assessing Relationship Between Guillain Barré Syndrome and Influenza Vaccine – Up to Date Literature Review*, 12 Cureus 3–4 (2020), filed as Ex. 54 (ECF No. 41-10)).

At the same time, however (and somewhat in contradiction to the theory he seemed to espouse), Dr. Santoro later listed mechanisms commonly associated with antigenic-triggered autoimmunity, including (among other things) molecular mimicry. First Santoro Rep. at 12. But he did not identify one, or any of them in concert, as more likely applicable to how the vaccines Petitioner received could have caused him to develop GBS. Dr. Santoro also discussed the

---

[5] In fact, cross-reactivity of autoantibodies due to molecular mimicry is the basis for how the flu vaccine *itself* is understood to cause GBS. *See* L. Martin Arias et al., *Guillain-Barré Syndrome and Influenza Vaccines: A Meta-Analysis*, 33 Vaccine 3773, 3773–75 (2015), filed as Ex. 55 (ECF No. 41-11); F. Horns et al., *Memory B Cell Activation, Broad Anti-influenza Antibodies, and Bystander Activation Revealed by Single-Cell Transcriptomics*, 30 Cell Rep. 1, 10 (2021), filed as Ex. 65 (ECF No. 42-6).

potential causal role of adjuvants (vaccine ingredients that boost the immune response) included in the HPV and Tdap vaccines at issue. *Id.* at 13. Although he noted that "the mechanisms of adjuvancy are not fully elucidated," they might play a role in encouraging immune dysregulation—perhaps by "protecting" a foreign antigen in a manner sufficient to induce an adaptive response that becomes autoimmune, or simply by accelerating the overall immune response between more than one contemporaneously-administered vaccines. *Id*. (citing A. Gavin et al., *Adjuvant-Enhanced Antibody Responses Occur Without Toll-like Receptor Signaling*, 314 Science 3 (May 14, 2007), filed as Ex. 69 (ECF No. 42-10)).

Dr. Santoro further addressed the other two causation prongs. *See generally* First Santoro Rep. at 14–15. First, he maintained that Petitioner's vaccinations likely "did cause" his GBS. He noted that although a post-infectious etiology was common in a pediatric/young patient population, there was in this case no evidence that Mr. Harmon had been experiencing any kind of wild infection before the onset of his neurologic symptoms, whether in the form of clinical symptoms or proof of infection derived from lab work. *Id.* at 13–14. He also had no other preexisting illnesses that could stand as explanations. *Id.* at 14.

Second, Dr. Santoro deemed the timeframe in which Petitioner's onset of GBS occurred to be medically acceptable. First Santoro Rep. at 12, 14–15. He noted as a general matter that acute demyelinating disorders had been observed to occur within five to 28 days after vaccinations (both single and multiply-administered doses). *Id.* at 12 (citing R. Baxter et al., *Acute Demyelinating Events Following Vaccines: A Case Centered Analysis*, 63 Clin. Infect. Dis. 1456, 1459 (2016), filed as Ex. 50 (ECF No. 41-6) ("Baxter"). Petitioner's first GBS symptoms had begun 12–19 days post-vaccination, and thus fell "within the appropriate time for onset of this rare, adverse, immune response to vaccination." *Id.* at 14, 15.

*Second Report*

Dr. Santoro's second report responded to the criticisms lodged against him by Respondent's experts (Drs. Michael Kruer and Andrew MacGinnitie). He devoted more of this supplemental report to commenting on Dr. Kruer's opinion, however, since his expertise did not extend to the immunologic matters discussed by Dr. MacGinnitie (and by this time Petitioner had engaged his own immunology expert, Dr. William Bradfute). Second Santoro Rep. at 9.

Dr. Santoro accepted Dr. Kruer's contention about the ways in which vaccines differ, but maintained that "one-to-one relationships between vaccines, infections, and other antigenic triggers are rare," and therefore GBS (which is known to have a variety of triggers) should be "viewed under a unique lens," especially since its possible immune-mediated mechanisms are not currently well understood. Second Santoro Rep. at 2. He also defended his prior reference to case reports, noting they at least confirmed the existence of a (temporal) post-vaccination event

regardless of causation, and that the rarity of GBS should be taken into account (meaning that large scale epidemiologic studies could never "rule out" a vaccine association). *Id.* at 2, 3. While case reports might have low evidentiary value generally, they still had *some* value (as demonstrated by the fact that "respected, peer-reviewed journals continue to publish them"). *Id.* at 3.

Dr. Santoro did attempt to identify statements in some of the filed epidemiologic articles that he deemed justified given them less weight. Second Santoro Rep. at 4–5. One study, for example, that was referenced by Respondent as rebutting an HPV vaccine-GBS association had itself noted some other studies reaching contrary findings. *See, e.g*., N. Andrews et al., *No Increased Risk of Guillain-Barre Syndrome after Human Papilloma Virus Vaccine: A Self-Controlled Case-Series Study in England,* 35 Vaccine 1729, 1730–31 (2017), filed as Ex. C-13 (ECF No. 49-13) ("Andrews") (noting that a "cohort study from France" that predated Andrews, but was discussed within it, had "found a significantly raised hazard ratio of 4.0 (95%CI: 1.8-8.7) for GBS. The report shows elevated risks at all times after HPV vaccination"). In addition, Andrews referenced "another, large-scale population-based study, identified a temporal relationship between the administration of the HPV vaccine and the onset of GBS. In traditional demyelinating disorders, exposure to an immunologic triggering antigen is common 4–10 weeks prior to the onset of symptoms, which is tightly correlated to what is endorsed in this report." Second Santoro Rep. at 4.

Similarly, another article acknowledged a possible Tdap-GBS association, but merely deemed that risk to be low. J. Tuttle et al., *The Risk of Guillain-Barre Syndrome After Tetanus-Toxoid–Containing Vaccines in Adults and Children in the United States*, 87 Am. J. Public Health 2045, 2047–48 (1997), filed as Ex. A-5 (ECF No. 47-5) ("Tuttle"). In Dr. Santoro's view, this was consistent with the existence of risk (as confirmed by case reports) of an otherwise-rare condition, and thus illustrated the problems in giving epidemiologic evidence suggesting a low incidence post-vaccination too much emphasis. Second Santoro Rep. at 4–5.

Dr. Santoro further endeavored to bulwark his differing comments about autoimmune mechanisms possibly implicated herein. He noted that of the three general autoimmune mechanisms he had referenced in his first report, molecular mimicry specifically had been identified as a possible pathogenic mechanism for GBS for the HPV and meningococcal vaccines. Second Santoro Rep. at 6 (citing D. Kanduc, *Molecular Mimicry Between Meningococcal B Factor H-Binding Protein and Human Proteins,* 10 Global Medical Genetics 311–12 (2023), filed as Ex. 78 (ECF No. 60-8) (quantifying the number of self-proteins that share lipoprotein factor H-binding protein pentapeptides found in a version of the meningococcal B vaccine); D. Calvin et al., *HPV and Molecular Mimicry in Systemic Lupus Erythematosus and an Impact of Compiling B-cell Epitopes and MHC-Class II Binding Profiles with in Silico Evidence,* 41 J. Biomolecular Structure Dynamics 12338, 12341 tbl. 1 (2023), filed as Ex. 79 (ECF No.60-9) (finding 27/32 viral peptides in HPV that share varying similarities with human peptides)). He also denied the value of articles

suggesting epitope spreading could not initially instigate an autoimmune process, deeming the article that seemed to stand for this point as advancing only a hypothesis rather than "objective scientific data." *Id*. at 7 (citing Y. Pacheco et al., *Bystander Activation and Autoimmunity,* 103 J. Autoimmunity 102301, 102309 (2019), filed as Ex. 81 (ECF No. 60-11) (review discussing studies performed that characterize bystander activation, and concluding that "bystander activation of T cells and B cells contributes to the understanding of the link between environmental agents and autoimmunity")). And he contended that all three mechanisms he had referenced "can, and likely do, all occur at the same time"—and thus it almost did not matter which initiated disease (or was triggered by vaccination). *Id*.

Dr. Santoro made a few final points in response to Dr. Kruer's criticisms. Regarding the possible pathogenic role of adjuvants, Dr. Santoro denied asserting they cause vaccine-associated adverse events, but emphasized that "the same data that demonstrates an accentuated immunologic response when adjuvants are used (which is desired) could also potentiate a maladaptive immunologic response in the same manner." Second Santoro Rep. at 5; *see also id.* at 10–11 (emphasizing (in response to Dr. MacGinnitie's argument about general benign environmental exposure to aluminum) that what is important is that "aluminum amplifies the immune response that the vaccine induces"). He also accepted that vaccines and infectious processes were not interchangeable, and seemed to agree that the cognate wild viruses or bacteria the relevant vaccines were intended to address were not *themselves* associated with GBS, but maintained his only point was that a wide variety of environmental triggers, including vaccines, were understood to be able to induce an immunologic response that could lead to an autoimmune disease. *Id.* And Dr. Santoro noted that his point about the autoimmune-stimulative effect of a paraneoplastic disease was only to show that different kinds of cancerous tumors could result in the same "antibody-mediated syndrome," underscoring the fact that aberrant immune responses did not only occur in one manner. *Id.* at 6.[6]

Dr. Santoro concluded with some reactions to Dr. MacGinnitie's points. Regarding autoimmune mechanisms, Dr. Santoro stressed that scientific literature demonstrated that certain autoreactive T cells were implicated in GBS despite an absence of direct homology (thus reducing the dependence of a showing of homology to establish how a foreign trigger like a vaccine might induce this kind of autoimmune disease). Second Santoro Rep. at 9 (citing L. Sukenikova et al., *Autoreactive T Cells Target Peripheral Nerves in Guillain-Barre Syndrome,* 626 Nature 160 (Feb. 1, 2024), filed as Ex. 72 (ECF No. 60-2) ("Sukenikova") (finding evidence of cross reactivity between human T cells and viral pathogens in patients with GBS)). He noted again that epitope

[6] Dr. Santoro included in this report as well a fairly lengthy, somewhat-argumentative section attempting to rebut Dr. Kruer's point that GBS was often deemed idiopathic in origin (combining it with an attack on retrospective data studies). Second Santoro Rep. at 7-8. In effect, he seemed to want to emphasize that "idiopathic" did not mean no cause, just an unknown cause. But this argument did not undermine Dr. Kruer's point—that the vaccine was not *more likely* causal just because other potential wild infectious causes were not confirmed in blood work (given that medical science frequently *accepts* idiopathic as the best possible explanation).

spreading was an "adjunct process" that could be implicated in an overall autoimmune disease process, even if it did not likely initiate the process (although implicitly this reduces the relevance of a mechanism that will not occur due to immediate vaccine stimulation—a lynchpin showing any Program claimant must make if a vaccine is to be found "more likely than not" causal). *Id.* at 10. And he said even if the immune system had built-in regulatory protections against processes like "bystander activation," that did not mean that dysregulation was not a possible contributing factor (although he deferred to Dr. Bradfute on this and related immunology topics). *Id.*

2. William Bradfute, Ph.D. – Dr. Bradfute, a viral immunologist, offered two written reports opining on how Petitioner's vaccines, specifically the HPV vaccine, could cause GBS. Report, dated December 6, 2024, filed as Ex. 89 (ECF No. 61-1) ("First Bradfute Rep."); Report, dated May 17, 2025, filed as Ex. 96 (ECF No. 67-2) ("Second Bradfute Rep.").

Dr. Bradfute is an Associate professor at the Center for Global Health at the University of New Mexico where he researches vaccines and immunity for emerging viruses. Curriculum Vitae, dated Dec. 10, 2024, filed as Ex. 90 (ECF No. 61-2) at 2. He graduated with a bachelor's in biology from Eastern New Mexico University before completing his Ph.D. at the Baylor College of Medicine in Houston, Texas. *Id.* at 1. After graduating, Dr. Bradfute completed two postdoctoral fellowships: one at the United States Army Medical Research Institute of Infectious Diseases, and one at the University of New Mexico. *Id.* Dr. Bradfute's research focuses on infectious diseases. *Id.* at 1–2. Over the course of his career, Dr. Bradfute has participated in human clinical trials and has published over fifty peer-reviewed scientific articles centered on host and pathogen-related topics, and a number of reviews, commentaries, and book chapters as well. *Id.* at 15–24.

*First Report*

Dr. Bradfute's first report sought to provide some immunological ballast for aspects of the causation theory proposed by Dr. Santoro—in particular, the capacity of the three vaccines at issue to trigger GBS. He began by discussing how the immune response "works." He noted that CD4+ T cells (also called "T helper cells") function in the immune system as "overseers of long-term immune responses" (and are known specifically to aid "B cells" in the production of antibodies in reaction to foreign antigens, although Dr. Bradfute's report did not expressly so indicate).[7] T helper cells are able to assist in the adaptive immune process (which is the immune phase in which antibodies to foreign antigens begin to be produced) because of receptors they possess which can interact with peptide sequences from the foreign antigens that later are presented to the immune

[7] T helper cells are "differentiated T lymphocytes whose cooperation (help) is required for the production of antibody against most (T-dependent) antigens." *Helper Cells,* Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=64157 (last visited June 3, 2026).

system by "major histocompatibility complex II" ("MHC II") proteins.[8] First Bradfute Rep. at 1. If a T helper cell "recognizes" a peptide held by an MHC II protein, it can then initiate the process of antibody production—but this becomes a harmful process when the peptide from the foreign antigen is similar (in structure or amino acid sequential composition) to a self-peptide. *Id.*

GBS, Dr. Bradfute explained, proceeds pathogenically via a "largely unknown" mechanism, but nevertheless is (based on one recently published item of literature) suspected to be mediated by T cells that target myelin antigens, "inducing disease by trafficking to nerves, causing inflammation and myelin destruction, and driving more autoimmunity with epitope spreading." First Bradfute Rep, at 1, 2 (discussing Sukenikova at 160–67 (investigating autoreactive T-cell immunity in patients with GBS, and finding increased levels of certain T-cells in GBS and AIDP patients, which suggests certain viral infections may induce T-cell activation that infiltrates peripheral nerves and creates inflammation of the area). Dr. Bradfute noted that Sukenikova's authors had concluded that the studied viral infections were able to stimulate pro-inflammatory T helper cells toward particular aspects of myelin, resulting in harm and an expanding autoimmune attack via secondary processes like epitope spreading, as well as later participation by autoreactive T cells. First Bradfute Rep. at 2. Sukenikova, however, did not assess the antigenic components found in the vaccines at issue (and as discussed herein deserves less weight for other reasons). *See id.* at 3.

Next, Dr. Bradfute endeavored to link the three vaccines in question to the autoimmune process he had outlined. Sukenikova had identified three "immunodominant" peptide sequences in myelin targeted there by T cells. First Bradfute Rep. at 2. But the three vaccines could be shown to contain peptides homologous with those three myelin sequences. To make this demonstration, Dr. Bradfute utilized an alignment software program (the "European Molecular Biology Open Software Suite," or "EMBOSS"),[9] and his search revealed matches for peptides found in components of the HPV and Tdap vaccines, compared with self-protein sequences (14 in total). First Bradfute Rep. at 3. In so doing, he emphasized that complete sequential identity was

[8] MHC proteins are cell-surface molecules that display peptides, allowing T-cells to distinguish between self and foreign antigens. *See* First Bradfute Rep. at 1. MHC II proteins are found on immune cells like macrophages, dendritic cells, and B-cells, and they display foreign antigenic peptide sequences to T helper cells, thereby assisting in the overall immune response. *See Class II Antigens,* Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=56885 (last visited June 3, 2026).

[9] Program experts more commonly employ "BLAST," or the "Basic Local Alignment Search Tool," to make a comparable showing of peptide sequence similarity. *See, e.g.*, *Zacharski v. Sec'y of Health & Hum. Servs*., No. 21-317V, 2025 WL 1235431, at *23 (Fed. Cl. Spec. Mstr. Mar. 26, 2025); *J.C. v. Sec'y of Health & Hum. Servs*., No. 17-69V, 2024 WL 3412625, at *7 (Fed. Cl. Spec. Mstr. May 16, 2024); *Trollinger v. Sec'y of Health & Hum. Servs*., No. 16-473V, 2023 WL 2521912, at *8 (Fed. Cl. Spec. Mstr. Feb. 17, 2023). But Dr. Bradfute has employed other tools before to find homologic structures. *Zacharski*, 2025 WL 1235431, at *17 (using European Bioinformatics Institute protein alignment algorithm "Clustal Omega" to identify homologic similarity).

unnecessary for mimicry sufficient to stimulate an autoimmune response. *Id.* This therefore suggested that "T cells targeting vaccine antigens could cross-react with myelin peptides." *Id.*

Dr. Bradfute admitted that T helper cells (a lynchpin of his causation mechanism in this case) "cannot recognize peptides" not already bound to an MHC II allele. First Bradfute Rep. at 3. He therefore attempted to determine if the 14 homologous peptide sequences he had found in his initial search could themselves bind to the allele. *Id.* To do so, Dr. Bradfute utilized the Immune Epitope Database ("IEDB"),[10] in order to determine if the homologous sequences were possibly meaningful in this regard. *Id.* at 3–4. He determined that three of the 14 sequences (all of which were found in a component of the HPV vaccine) "were predicted" to bind to the MHC II allele—and thus theoretically could instigate a cross-reaction with T helper cells that might in turn spark GBS. *Id.* at 4. Dr. Bradfute added that "computational predictions of the possibility of generation of these responses represent a logical approach to address these complex questions," since "direct laboratory analysis" of what T cells would in fact cross react against myelin (in the case of Petitioner, at least) was not possible. *Id.*

*Second Report*

Dr. Bradfute prepared a succinct supplemental report responding to the criticisms of Respondent's immunologic expert, Dr. MacGinnitie. First, he defended the significance of the amino acid sequence homologies he had identified that were shared between certain vaccine protein components and likely myelin targets for GBS. Second Bradfute Rep. at 1–2. Dr. Bradfute emphasized that "regions of similarity" existed between the compared proteins (even if the proteins themselves were not "highly related"), and the likelihood of binding between them was corroborated by animal models[11] that showed direct inoculation with myelin peptides would generate both antibody and T cell responses. *Id.* at 1–2 (citing F. Mokhtarian et al., *Molecular Mimicry Between Viral Peptide and a Myelin Oligodendrocyte Glycoprotein Peptide Induces Autoimmune Demyelinating Disease in Mice,* 95 J. Neuroimmunology 43, 52 (1999), filed as Ex. 97 (ECF No. 67-3) ("Mokhtarian").

---

[10] The IEDB catalogs experimental data on antibody and T cell epitopes studied in humans and other animal species in the context of infectious disease, allergy, autoimmunity and transplantation. Immune Epitope Database & Tools, https://www.iedb.org/ (last visited June 3, 2026). Dr. Bradfute has also used IEDB over BLAST previously, stating that it has an 85% accuracy rate for predicting binding between peptides and human molecules. *Zacharski*, 2025 WL 1235431, at *18.

[11] The specific model is known as "experimental autoimmune encephalomyelitis," or "EAE," and pertains more to central nervous system demyelinating conditions like multiple sclerosis, although it is not wholly irrelevant to a peripheral neuropathy either.

Dr. Bradfute acknowledged (as Dr. MacGinnitie had contended) that performing a search for sequential homology via a different analytic tool, BLAST,[12] did not reveal significant similarity. Second Bradfute Rep. at 2. But he had himself utilized BLAST to assess whether the findings in Mokhtarian would be confirmed, by comparing the viral antigen protein sequence used in that study (from the Semliki Forest virus) with the self myelin peptide at issue, and found BLAST did not confirm any similarities. *Id.* at 1 fig. 1. From this, Dr. Bradfute concluded that "the use of BLAST to identify small regions of molecular mimicry is inaccurate and not the correct tool to use." *Id.* at 2. (This view should perhaps be shared with the innumerable experts who consistently rely on BLAST in Vaccine Program cases).

In response to Dr. MacGinnitie's argument that homologic amino acid sequences were common in nature (but did not lead to a comparable level of autoimmune disease prevalence), Dr. Bradfute pivoted to the fact that "established scientific consensus" agreed that molecularly mimicry *can* be the basis for an autoimmune disease mechanism (although this response somewhat misses the point of Dr. MacGinnitie's comment). Second Bradfute at 2. Dr. Bradfute also allowed that sequential similarity *alone* was insufficient to make an autoimmune reaction likely, but noted that this was why he went on to look at myelin sequences known to be significant in GBS (as addressed in Sukenikova). *Id.* And although the immune system has built-in tolerances and safeguards to ward against autoimmune responses, it remained possible "in rare instances" that a vaccine could overcome these protections. *Id.* at 3.

Second, Dr. Bradfute sought to defend his conclusion that the peptide similarities he had illustrated in his first report were likely to result in a harmful demyelinating cross-reaction. He noted that since actual lab analysis of the capacity of the relevant sequences to cause GBS was unavailable, the best that could be done was a "computational" approach. Second Bradfute Rep. at 2. He stressed as well the reasonableness of his finding, since it narrowed from an initial determination of 14 similar sequences down to three (albeit limited to the HPV vaccine) that might bind. He again noted that Sukenikova underscored the significance of the activation of T helper cells at the self antigen situs in the pathogenesis of GBS. *Id.*

In reaction to Dr. MacGinnitie's contention that it had not been shown that Petitioner possessed the MHC II alleles likely required for an autoimmune cross reaction to later occur (in part because they are uncommon), the odds he *did* possess them were still "hardly miniscule." Second Bradfute Rep. at 3. And the likelihood of binding was in fact high given the accuracy of the IEDB. *Id.* (citing W. Fleri et al., *The Immune Epitope Database and Analysis Resource in Epitope Discovery and Synthetic Vaccine Design,* 8 Frontiers Immunology 1, 2 (Mar. 2017), filed as Ex. 99 (ECF No. 67-5)).

---

[12] *See* n.9 above.

Dr. Bradfute disputed Dr. MacGinnitie's argument that the antibody-production "goal" of the HPV vaccine was incompatible with driving GBS, which involved a disease process that is known to be T cell-mediated. Second Bradfute Rep. at 3. He contended that it is "well-established" that the HPV vaccine does induce T cell helper responses as well as antibodies. *Id.* (citing M. Munk-Madsen et al., *Cellular Immunogenicity of Human Papillomavirus Vaccines Cervarix and Gardasil in Adults with HIV Infection,* 14 Hum. Vaccines & Immunotherapeutics 909, 915 (2018), filed as Ex. 101 (ECF No. 67-7); K. Matsui et al., *Circulating CXCR5$^{+}$CD4$^{+}$ T Follicular-Like Helper Cell and Memory B Cell Responses to Human Papillomavirus Vaccines,* 10 Plos One 1 (Sep. 2, 2015), filed as Ex. 102 (ECF No. 67-8)). He further noted that for an antibody response to any vaccine to prove "long-lived," assistance from T helper cells was inevitably necessary. S. Swain et al., *Expanding Roles for CD4$^{+}$ T Cells in Immunity to Viruses,* 12 Nature Reviews: Immunology 136, 139 (Feb. 2012), filed as Ex. 104 (ECF No. 67-10).

B. *Respondent's Experts*

1. <u>Dr. Michael Kruer</u> – Dr. Kruer is a pediatric neurologist, and he provided a single written report opining on Petitioner's causation theory. Report, dated August 21, 2023, filed as Ex. A (ECF No. 44-1) ("Kruer Rep.").

Dr. Micheal Kruer graduated from Arizona State University where he studied microbiology and psychology before earning his M.D. at the University of Arizona College of Medicine in Tucson, Arizona. Curriculum Vitae, dated Oct. 21, 2025, filed as Ex. F (ECF No. 70-1) ("Kruer CV") at 1. He underwent a postdoctoral fellowship in neurogenomics at the Translational Genomics Research Institute, and then spent his residency in pediatrics at the Phoenix Children's Hospital. *Id.* Dr. Kruer is board-certified in pediatrics, child neurology, and neurodevelopmental disabilities, and has devoted significant time researching the role of autoimmunity in neurological disease. *Id.* at 22; Kruer Rep. at 1. Currently, Dr. Kruer is an associate professor at the University of Arizona College of Medicine where he serves as the director of both the Pediatric Neuroimmunology Program and the Pediatric Movement Disorders Program. Kruer CV at 1–2. Over the course of his career, Dr. Kruer has published over one hundred peer reviewed articles. *Id.* at 3–18.

Based upon a brief summary of Petitioner's medical history, Dr. Kruer deemed the GBS diagnosis "not in dispute." Kruer Rep. at 2. But Dr. Kruer rejected Dr. Santoro's contention that the vaccines Petitioner had received could have caused his GBS. He stressed the fact that vaccines were often quite different in composition and immunologic effect, typically intended to confer protection against an individual disease or limited set of diseases. *Id.* As a result, what was believed about the capacity of one vaccine to cause a particular adverse event was not necessarily applicable to another.

"Rigorous studies," Dr. Kruer maintained, had demonstrated a lack of causal association between GBS and the three vaccines at issue. Kruer Rep. at 2–3. Several articles, he maintained, undercut an HPV-GBS association. *See id.* (citing J. Gee et al., *Risk of Guillain-Barre Syndrome Following Quadrivalent Human Papillomavirus Vaccine in the Vaccine Safety Datalink,* 35 Vaccine 5756, 5757–58 (2017), filed as Ex. A Tab 2 (ECF No. 47-2) ("Gee") (assessing multiple studies and finding no evidence of an increased risk of GBS following the HPV vaccine); Andrews at 1729 (finding "no evidence of an increased risk of GBS following HPV vaccination in England"). The same had been demonstrated for the Tdap and meningococcal vaccines. *Id.* (citing Tuttle at 2047 (finding no increased risk of developing GBS after receiving the Tdap vaccine); P. Velentgas et al., *Risk of Guillain-Barre Syndrome After Meningococcal Conjugate Vaccination*, 21 Pharmacoepidemiology & Drug Safety 1350, 1355–57 (2012), filed as Ex. A Tab 4 (ECF No. 47-4) ("Velentgas") (finding no risk association between the meningococcal vaccine and GBS); W. Yih et al., *No Risk of Guillain-Barre Syndrome Found After Meningococcal Conjugate Vaccination in Two Large Cohort Studies,* 21 Pharmacoepidemiology & Drug Safety 1359, (2012), filed as Ex. C Tab 12 (ECF No. 46-12) ("Yih 2012") (finding no instances of GBS after millions of meningococcal vaccine doses)). And only the flu vaccine was deemed to have enough of a causal relationship to GBS to be the subject of a Program Table claim (in which case causation is presumed). *Id.*

Dr. Santoro, however, could point to no comparable studies supporting an association, and instead could only rely on case reports—a kind of evidence Dr. Kruer deemed "prone to spurious associations that do not stand up after more rigorous medical and scientific studies." Kruer Rep. at 2 Fig. A (scientific "evidence pyramid" designated case series or reports to occupy a low tier of evidentiary validity). Thus, little to no probative evidence had been offered by Dr. Santoro directly linking the vaccines Petitioner received with GBS.

Dr. Santoro's other explanations for how the relevant vaccines could cause GBS were also unpersuasive to Dr. Kruer. Arguments about adjuvants, for example, had not been substantiated with evidence that they could trigger an autoimmune reaction. The contention that vaccines had the same capacity to cause an autoimmune disease as a wild infection was not backed up with any proof connecting any of the relevant vaccines' wild viral or bacterial analogs to GBS. Kruer Rep. at 3.

Dr. Kruer similarly questioned Dr. Santoro's proposal that multiple vaccines might potentially cause GBS, given that they could be implicated in more than one kind of demyelinating phenotype. Dr. Santoro's conclusion on this point was not, Dr. Santoro contended, "self-evident," since there existed diseases known to be caused by a single autoantibody (like myelin oligodendrocyte glycoprotein associated-disease, or "MOGAD") but which featured multiple kinds of clinical phenotypic presentations. *Id.* And Dr. Santoro's reference to paraneoplastic disease as not involving molecular mimicry (due to homologic similarity between self-tissues and

tumors, resulting in autoantibody cross-reactivity) was incorrect, with studies showing this is precisely how an immune response to a tumor could produce autoantibodies capable of attacking similar self-protein components. *Id.* at 4 (citing R. Darnell & J. Posner, *Paraneoplastic Syndromes Affecting the Nervous System,* 33 Seminars Oncology 270 (2006), filed as Ex. A Tab 7 (ECF No. 47-7)).[13]

Dr. Kruer concluded by noting that the record did not support the conclusion that the vaccines Mr. Harmon received had caused his GBS. Although Dr. Santoro highlighted the lack of evidence of a prior infection, it was a "false dichotomy" to presume that a vaccine caused an injury in the absence of proof of a prior infection, given that a third of the time a case of GBS lacked any "clear antecedent." Kruer Rep. at 5. And Dr. Santoro's argument that generalized immune dysregulation could explain GBS undercut the significance of the presence or absence of evidence of an antecedent infection. *Id.* There was no other record evidence affirmatively linking the vaccines Petitioner received to his GBS. *Id.* at 6.

2. <u>Dr. Andrew MacGinnitie</u> – Dr. MacGinnitie, a medical immunologist, offered two expert reports in this case in support of Respondent. Report, dated August 21, 2023, filed as Ex. C (ECF No. 44-3) ("First MacGinnitie Rep."); Report, dated March 4, 2025, filed as Ex. E (ECF No. 65-1) ("Second MacGinnitie Rep.").

Dr. MacGinnitie is the Division Chief for the Division of Allergy, Asthma, and Immunology at Children's Wisconsin in Milwaukee and is a Professor of Pediatrics at the Medical College of Wisconsin. Curriculum Vitae, dated Oct. 21, 2025, filed as Ex. G (ECF No. 70-2) ("MacGinnitie CV") at 3. He received both his medical degree and Ph.D. in Pathology from the University of Chicago. Thereafter, he completed a residency in pediatrics in the Boston Combined Residency Program, a joint venture of Boston Children's Hospital and Boston Medical Center, followed by a fellowship in allergy/immunology at Boston Children's Hospital. *Id.* at 1. During the pendency of this case, Dr. MacGinnitie was promoted to Division Chief from his prior role as Clinical Chief of the Division of Immunology at Boston Children's Hospital. *See id.* at 3. In his prior role, he saw approximately 1,500 patients annually who suffered from a variety of immunologic diseases. *See id.*; First MacGinnitie Rep. at 2. He continues to treat patients and teach in his new role. *See generally* MacGinnitie CV; Second MacGinnitie Rep. at 1.

[13] Dr. Kruer also specifically addressed the three possible autoimmune mechanistic processes listed in Dr. Santoro's report (such as molecular mimicry and bystander activation), and why Dr. Kruer believed they were not shown to be relevant to the present circumstances. Kruer Rep. at 4-5. But because Dr. Santoro himself did not link these mechanisms back to this case or emphasize them particularly in his own report, I do not address the substance of this particular criticism by Dr. Kruer.

*First Report*

Dr. MacGinnitie's initial report responded only to the opinions advanced in Dr. Santoro's first report. First MacGinnitie Rep. at 2. He included his own summary of Petitioner's medical history (although Dr. MacGinnitie did not advance a diagnostic opinion, and is not a neurologist). *Id.* at 2–5. Relying on Dr. Kruer's opinion, Dr. MacGinnitie determined that Petitioner had experienced GBS within two weeks of his receipt of the three relevant vaccines. *Id.* at 5.

Dr. MacGinnitie generally characterized Dr. Santoro's causation opinion as "vague," since it grouped all three relevant vaccines as almost jointly causal of Petitioner's GBS, listing several potential autoimmune-triggering mechanisms but not specifying which were most likely under his theory. First MacGinnitie Rep. at 5. By contrast, Dr. MacGinnitie maintained that not one of the three could be applied herein.

The molecular mimicry mechanism, for example, was not in Dr. MacGinnitie's view applicable in the context of the Tdap, HPV, and/or meningococcal vaccines. First MacGinnitie Rep. at 5–7. He did not dispute Dr. Santoro's description of the mechanism—that "[t]he immune response to infection or vaccination can result in cross-reactive antibodies or T-cells which recognize the self (human) antigen, leading to disease"—and that GBS was understood in "specific circumstances" to have molecular mimicry as a pathogenic mechanism (such as after a GI infection attributable to the *C. Jejuni* bacterium). *Id.* at 5, 6.

However, Dr. MacGinnitie noted that literature filed by Dr. Santoro set forth four criteria that medical science understood needed to be satisfied if molecular mimicry is to be deemed a viable pathogenic explanation for an autoimmune condition. M. Rojas et al., *Molecular Mimicry and Autoimmunity,* 95 J. Autoimmunity 100, 103 (2018), filed as Ex. 60 (ECF No. 41-16) ("Rojas"); First MacGinnitie Rep. at 6 (identifying the need for proof of homologic similarity between self-epitope and foreign antigen components, evidence of antibodies that cross-react with both, evidence that the relevant "environmental agent" is associated with the relevant autoimmune condition, and confirmation via an animal model test that exposure to the foreign antigen results in the autoimmune condition at issue).

None of these criteria had been shown by Dr. Santoro to be satisfied, in Dr. MacGinnitie's view, for any of the three relevant vaccines. First MacGinnitie Rep. at 6. In fact, while a number of wild infections had been shown to be likely associated with GBS (*C. jejuni* as well as cytomegalovirus, Epstein-Barr virus, or hepatitis E), these did "not include any of the microbes [Petitioner] was being vaccinated for." *Id.* at 7. And Dr. Santoro otherwise could only offer case reports involving post-infectious GBS—which again were not analogs for the components of HPV, Tdap, or meningococcal vaccines. *Id.* Thus, evidence that molecular mimicry could explain how

the vaccines at issue caused Petitioner's illness was lacking.[14] (Dr. MacGinnitie later disputed the validity of Dr. Santoro's contention that a GBS association with vaccination might not even require molecular mimicry, noting the possibility of coincidence in explaining why case reports observed demyelinating illnesses after different vaccines. First MacGinnitie Rep. at 10).

More broadly, Dr. MacGinnitie questioned the existence of evidence more directly linking the relevant vaccines to GBS. First MacGinnitie Rep. at 8–10. Studies referenced by Dr. Santoro as revealing a heightened incidence of GBS post-vaccination mainly involved the flu vaccine. *Id.* at 8. Some studies cited as proof of a Tdap vaccine-GBS relationship involved only passive surveillance data, which did not meet methodologic standards of scientific reliability, and did not stand as reliable proof of causation. *Id.* at 9 (references omitted). In contrast, some "large epidemiologic studies" had found no reliable association between GBS and the meningococcal vaccine. *See, e.g.*, Velentgas at 1355–57. And evidence of an association with HPV vaccine was also limited to case reports involving small numbers of observed incidents, while being rebutted by larger studies. First MacGinnitie Rep. at 9-10 (citing Andrews at 1731 tbl. 2; L. Grimaldi-Bensouda et al., *Guillain-Barre Syndrome, Influenzalike Illnesses, and Influenza Vaccination During Seasons With and Without Circulating A/H1N1 Viruses,* 174 Am. J. Epidemiology 326, 331 (2011), filed as Ex. C Tab 16 (ECF No. 49-16); L. Arnheim-Dahlstrom et al., *Autoimmune, Neurological, and Venous Thromboembolic Adverse Events After Immunization of Adolescent Girls with Quadrivalent Human Papillomavirus Vaccine in Denmark and Sweden: Cohort Study,* 347 BMJ 1, 5 (Aug. 28, 2013) (ECF No. 49-14) ("Arnheim-Dahlstrom")).

Dr. Santoro's proposal of the potential pathogenic role that vaccine adjuvants might play in promoting GBS was similarly rejected by Dr. MacGinnitie. First MacGinnitie Rep. at 10-11. He noted that the Tdap and HPV vaccines both specifically contained a particular kind of adjuvant, aluminum salts, or alum—one "used in vaccines for more than 80 years," and which "has an excellent safety profile after billions of doses." *Id.* at 10 (citing H. Hogenesch, *Mechanism of Immunopotentiation and Safety of Aluminum Adjuvants,* 3 Frontiers in Immunology 1, 9 (Jan. 2013), filed as Ex. C Tab 19 (ECF No. 49-19) ("aluminum adjuvants reduce the prevalence and severity of systemic adverse reactions by binding and slowly releasing molecules thereby reducing toxicity")). Not only was this adjuvant not likely to increase the chance of an aberrant response, but exposure to the human immune system from the exceedingly small amounts of alum contained in a vaccine was miniscule compared to the exposure to aluminum that people received from the environment every day. First MacGinnitie Rep. at 10. Allergen immunotherapy also involves receipt of larger doses of aluminum than what vaccines contained, but with no observed autoimmune adverse effects. R. Ameratunga et al., *Evidence Refuting the Existence of Autoimmune/Autoinflammatory Syndrome Induced by Adjuvants (ASIA),* 5 J. Allergy Clin.

[14] Dr. MacGinnitie also evaluated the evidentiary strength of Dr. Santoro's reference to other autoimmune disease mechanisms, like epitope spreading. First MacGinnitie Rep. at 7–8. But these were referenced in Dr. Santoro's first report in an almost aside-like manner, and he did not particularly endorse the explanatory power of any of these alternative or complimentary mechanisms, and I thus do not discuss Dr. MacGinnitie's criticisms of them herein.

Immunol. Pract. 1551, 1553–54 (2017), filed as Ex. C Tab 23 (ECF No. 49-23) (noting a decreased incidence of autoimmune disease in persons who had received aluminum-containing allergen-specific immunotherapy)).

Dr. MacGinnitie further set forth his basis for concluding that the vaccines Petitioner received did not cause his GBS (regardless of their potential capacity to do so). First MacGinnitie Rep. at 11. Dr. Santoro had highlighted the lack of evidence of a pre-vaccination infection of some kind as leaving the vaccines as the only remaining explanation, but Dr. MacGinnitie observed that it was common in GBS for treaters *not* to observe some specific pre-onset infectious explanation, even if an infection was hinted at. *Id.* (citing S. Leonhard et al., *An International Perspective on Preceding Infections in Guillain-Barre Syndrome,* 99 Neurology 1299, 1300 (Sep. 20, 2022), filed as Ex. C Tab 5 (ECF No. 49-5) (three quarters of individuals analyzed had pre-onset illness symptoms, but only about a half of the individuals had serologic evidence of a recent infection)). In addition, Dr. MacGinnitie noted that infectious causes of GBS (which Dr. Santoro compared to the impact of vaccination) usually involved evidence of an inflammatory response "generated as part of the response to infection"—but here there was no evidence Petitioner's GBS onset was preceded by inflammation or related symptoms. *Id.* And while Petitioner's treaters had taken into account Petitioner's vaccinations, none had proposed the vaccines were causal of GBS (and they had also noted that Petitioner had *not* received the flu vaccine—which as noted above is the only vaccine clearly associated with GBS). *Id.*

*Second Report*

Dr. MacGinnitie's supplemental report responded to Drs. Bradfute's and Santoro's criticisms (although primarily focusing on the immunologic issues addressed by Dr. Bradfute).[15] He began by noting that none of the four accepted scientific criteria for embracing molecular mimicry as a likely cause of an autoimmune disease had been shown to have been fulfilled. Second MacGinnitie Rep. at 1. Rather, all Dr. Bradfute had done was demonstrate potential "meaningful homologies" between protein sequences in the vaccines Petitioner had received and targets for autoimmune attack identified in Sukenikova. *Id.*

But this showing was inadequate, Dr. MacGinnitie contended, to meet even the first criteria needed for molecular mimicry to have explanatory power. Second MacGinnitie Rep. at 2–7. First, he stressed that "similarities between microbial and human proteins is common," and therefore the homologies Dr. Bradfute's computer search had identified could well just reflect chance. *Id.* at 2. In support, Dr. MacGinnitie noted that literature revealed substantial instances of five to seven amino acid peptide chain similarity between human protein sequences and viral sequences found

[15] With respect to Dr. Santoro, Dr. MacGinnitie merely reiterated his point that case reports were recognized to merit little evidentiary weight, and that Petitioner had failed to refute the epidemiologic studies that found no increased incidence of GBS after receipt of any of the relevant vaccines in this case. Second MacGinnitie Rep. at 7–8.

in the relevant vaccines, like HPV. *Id.* at 3 (citing B. Trost et al., *Bacterial Peptides are Intensively Present Throughout the Human Proteome,* 1 Self/Nonself 71, 71–74 (2010), filed as Ex. E Tab 3 (ECF No. 65-4); D. Kanduc et al., *Massive Peptide Sharing Between Viral and Human Proteomes*, 29 Peptides 1755, 1755–66 (Oct. 2008), filed as Ex. E Tab 2 (ECF No. 65-3)). If molecular mimicry alone was likely to lead to autoimmune disease, it should be a far *less* rare occurrence given the degree of homologic similarity already happening in nature. Second MacGinnitie Rep. at 3–4. And indeed, this fact recognized by medical science. *Committee to Review Adverse Effects of Vaccines: Evidence and Causalit*y 59–60 (K. Stratton et al., eds., 2012), filed as Ex. E Tab 4 (ECF No. 65-5) (the "IOM Rep.").

Second, Dr. MacGinnitie reiterated his point that the immune system possessed "substantial safeguards" to prevent autoimmune disease. Second MacGinnitie Rep. at 7. Not only did the immune system have regulatory processes in place to ward against active cross-reactivity, but T-cells likely to cross-react against self would either be deleted in the thymus before production and circulation, or "lose the ability to become active when they recognize proteins in the absence of costimulatory signals" once in the periphery. *Id.* Dr. MacGinnitie admitted that these checks and balances could fail, but denied that Dr. Bradfute had demonstrated how the relevant vaccines were likely to bypass them.

In order to test Dr. Bradfute's homology findings, Dr. MacGinnitie conducted his own search with a different (and more commonly used in the Vaccine Program) search tool, "BLAST," noting that the software includes an "expected value" backstop to evaluate "how probable or improbable it is that such a match could have occurred by chance." Second MacGinnitie Rep. at 2 (citing D. Wheeler & M. Bhagwat, *Comparative Genomics* ch. 9, at § 1.4 (2007), filed as Ex. E Tab 1 (ECF No. 65-2)). That expected value would need to be less than or equal to .05 to be somewhat scientifically important (although the true value was much lower). Second MacGinnitie Rep. at 2. Dr. MacGinnitie's search relied on the protein sequences Dr. Bradfute had deemed meaningful—and yet found that the results were consistently not considered significant by the BLAST metrics. Second MacGinnitie Rep. at 3.

The next step in Dr. Bradfute's analysis—in which he utilized the IEDB to demonstrate that certain HPV vaccine component peptides could likely bind with certain MHC molecules in "putatively similar myelin proteins"—was similarly deficient, in Dr. MacGinnitie's view. Second MacGinnitie Rep. at 4. For one thing, it amounted to no more than a prediction, and was not substantiated with evidence suggesting cross-reactivity would likely occur. *Id.* The capacity of a foreign peptide to bind to an MHC molecule did mean an autoimmune process was likely as a result. And absent "other activating signals," T cells that might drive an autoimmune attack would fail to activate, while the T cells activated in the wake of MHC binding were not themselves necessarily the ones most likely to cross-react with myelin. *Id.* at 4–5 (citing K. Ashby & K.

Hogquist, *A Guide to Thymic Selection of T Cells,* 24 Nature Revs. Immunology 103, 106 (Feb. 2024), filed as Ex. E Tab 6 (ECF No. 65-7)).

A secondary problem relating to this aspect of Dr. Bradfute's opinion, Dr. MacGinnitie contended, was his reliance on MHC II proteins as vehicles for mimicry leading to cross-reactivity. Second MacGinnitie Rep. at 5–6. Dr. MacGinnitie deemed MHC molecules "among the most variable known human proteins," but it had not been shown in this case that Petitioner likely possessed the specific MHC II alleles that were deemed by Dr. Bradfute to allow for binding between HPV vaccine peptides and peripheral myelin. *Id.* at 5. Dr. MacGinnitie utilized an internet tool to demonstrate that the identified MHC II alleles were in fact extremely uncommon. *Id.* at 5–6.

A more fundamental deficiency in Dr. Bradfute' causation theory identified by Dr. MacGinnitie was the fact that the HPV vaccine's core function was inconsistent with how GBS was understood to occur. Second MacGinnitie Rep. at 6–7. He noted Dr. Bradfute's concurrence with the proposition that the demyelination characterizing the autoimmune cross-reaction in GBS was attributable to *T-cell recognition* of myelin components. *Id.* at 6 (citing First Bradfute Rep. at 1–2). The HPV vaccine, however (like most vaccines directed against wild viral infections), was formulated to generate *antibodies* that would later bind against a wild virus to prevent it from infecting human cells. *Id.* (citing J. Schiller & D. Lowy, *Understanding and Learning From the Success of Prophylactic Human Papillomavirus Vaccines,* 10 Nature Revs. Microbiology 681, 682–84 (Oct. 2012), filed as Ex. E Tab 8 (ECF No. 65-9); K. Wilson et al., *Inflammatory/Noninflammatory Adjuvants and Nanotechnology—The Secret to Vaccine Design* §6.4.1, at 106 (2017), filed as Ex. E Tab 9 (ECF No. 65-10)). Thus, receipt of the HPV vaccine would later result in evidence of increased levels of antibodies against the wild virus. *Id.* The vaccine, moreover, was not useful in fighting an existing infection (which would require T cells to drive back the infection). *Id.* (citing A. Yang et al., *The Current State of Therapeutic and T Cell-based Vaccines Against Human Papillomaviruses,* 231 Virus Res. 148, 149 (2017), filed as Ex. E Tab 13 (ECF No. 65-14)). Thus, Dr. Bradfute's theory assumed without explanation that generation of "an antibody dominant response could trigger GBS," even though his theory highlighted the role of T cells. *Id.* at 7.

## III. Procedural History

The Petition was filed more than five years ago, and assigned to a different special master in early 2021. After some initial efforts at settlement, Respondent's Rule 4(c) Report opposing compensation was filed in October 2022 (ECF No. 31), and the parties next engaged in expert discovery through the spring of 2025. The matter was reassigned to me in February 2025 (prior to the filing of the final expert report), and I thereafter set a schedule for briefing the claim via ruling on the record. That briefing was completed in November 2025, with the filing of Petitioner's Reply Brief and the case has since that time been ripe for resolution.

## IV. Parties' Arguments

*Petitioner*

Petitioner maintains that all three causation prongs established by the Federal Circuit in *Althen v. Sec'y of Health & Hum. Servs*., 418 F.3d 1274, 1278 (Fed. Cir. 2005), are satisfied herein. Br. at 1–2. First, he argues that the "can cause" prong is met. *Id.* at 19. Petitioner's theory heavily relies on molecular mimicry between the three vaccines Petitioner received and myelin proteins, but also includes epitope spreading and bystander activation. *Id.* at 19–20, 24.

Petitioner's argument first focuses on the relationship between the HPV vaccine and GBS (an association heavily discussed by Drs. Bradfute and Santoro in their reports). Dr. Bradfute's analysis offered literature identified certain peptide sequences in myelin proteins that have been targeted by T cells in GBS's pathogenesis, and those peptides had "significant similarity" with antigens found in the HPV vaccine. *Id.* at 20–23 (discussing First Bradfute Rep. at 2–4). Petitioner argues that the findings of homologous structures between the two lends itself to the theory that molecular mimicry facilitated Petitioner's GBS. *See id.*

Petitioner uses Dr. Santoro's report to build upon Dr. Bradfute's findings. Dr. Santoro observed that the body's response to a vaccine and infection are similar, and therefore it can be inferred that the antigens common to vaccines and wild viral or bacterial infections could equally trigger GBS via molecular mimicry. *Id.* at 20–24 (citing First Santoro Rep. at 8–12). Petitioner highlights the case reports and literature offered by Dr. Santoro that note GBS occurring after influenza, hepatitis E, dengue, Zika, and the chikungunya virus. *Id*. at 23–26 (referencing Lima and Yu). Although case reports may not prove causation alone, they can contribute valuable information to the establishing of a causal link. *Id*. Further, the case reports of GBS developing after vaccines and viruses support Dr. Santoro's analogy between the two.

The Tdap and meningococcal vaccines could also cause GBS, Petitioner claims. Br. at 24. Instances of GBS occurring in individuals after administration of these vaccines has been documented in case reports and VAERS data, as discussed by Dr. Santoro. *Id.* at 24–25 (referencing Myers 2017 at 7; Myers 2020 at 1). These surveillance data findings showed adverse events, including GBS, triggered by a form of meningococcal vaccine. *Id.* (discussing Myers 2017 at 7; Myers 2020 at 1). These vaccines could trigger GBS through molecular mimicry between the vaccines and self-antigens, with any autoimmune process thereafter secondarily amplified through epitope spreading. Br. at 25. Sukenikova in particular supported this possibility for GBS. *Id.* (discussing Sukenikova at 8).

To further strengthen his claim, Petitioner also referenced some prior Program cases that had found entitlement for claims of GBS from tetanus toxoid containing vaccines, meningococcal

vaccines, and HPV vaccines. Br. at 26 n.3 (discussing *Almudhari v. Sec'y of Health & Hum. Servs.*, No. 22-1599V, 2023 WL 9118892 (Fed. Cl. Spec. Mstr. Dec. 13, 2023) (parties settled claim of GBS developing after petitioner received a series of vaccines including meningococcal, Tdap, and HPV vaccine); *Harris v. Sec'y of Health & Hum. Servs.*, No. 18-944V, 2023 WL 2583393 (Fed. Cl. Spec. Mstr. Feb. 21, 2023) (entitlement granted for a GBS injury after tetanus toxoid-containing vaccine); *Mohamad v. Sec'y Health & Hum. Servs*., 2022 WL 711604 (Fed. Cl. Spec. Mstr. Jan. 27, 2022), *mot. for review den'd*, No. 16-1075V, 2024 WL 4943421 (Fed. Cl. Nov. 12, 2024) (finding entitlement for a petitioner from a tetanus toxoid containing vaccine); *D.S. v. Sec'y of Health & Hum. Servs.*, No. 10-077, 2015 WL 8409472 (Fed. Cl. Spec. Mstr. May 19, 2015) (granting entitlement to petitioner who developed GBS after receiving an HPV vaccine); *Whitener v. Sec'y of Health & Hum. Servs.*, No. 6-477V, 2009 WL 3007380 (Fed. Cl. Spec. Mstr. Sep. 2, 2009) (entitlement found on a claim of GBS following a meningococcal vaccine)).

Petitioner then addressed Respondent's arguments in opposition of his claim. Br. at 26–36. Dr. MacGinnitie had specifically criticized Petitioner's invocation of molecular mimicry, arguing that the accepted medical/scientific criteria for its embrace had not been satisfied. *See id.* at 26–27 (citing First MacGinnitie Rep. at 6; Rojas at 4). In response, Petitioner notes that Dr. MacGinnitie conceded that meeting all four criteria "might be unreasonable to require fulfillment in an individual case," and that he had implied that identifying "significant homology" would be the most important aspect of establishing the existence of molecular mimicry. *Id.* at 27 (quoting First MacGinnitie Rep. at 6). And Dr. Bradfute had, in fact, found significant homology between Petitioner's vaccines and self-proteins. *Id.* In addition, Dr. Bradfute also identified myelin peptides that were targeted by T cells (as reflected in Sukenikova), thus meeting another of the relevant criteria. *Id.* at 27. Otherwise, the criteria applied by Dr. MacGinnitie represent a standard higher than the Program's preponderance standard (and thus could not be invoked against Petitioner). *Id.* at 29.

Drs. MacGinnitie and Kruer also criticized Petitioner's lack of epidemiological evidence and animal model studies. Br. at 27–29. In response, Petitioner maintains that even if no such population-level risk exists, studies could never fully rule out the *individual* risk. *Id.* at 28 (citing Second Santoro Rep. at 3). In so arguing, however, Petitioner acknowledged that the existing epidemiologic data showed no association between GBS and any of the relevant vaccines. *Id.* (citing Kruer Rep. at 2). And animal model analyses are impractical for evaluating vaccine risk (again due to rarity of injury). *Id.* at 29.

Petitioner also defends Dr. Bradfute's homology findings and his choice not to use BLAST search in reaching his conclusions. Br. at 30–32. As Dr. Bradfute explained, BLAST is poorly suited to detect short, biologically relevant similarities. *See id.* To prove this point, Dr. Bradfute conducted a BLAST search between a self-protein and a protein with a confirmed relationship with an autoimmune disease: EAE. *Id.* at 31 (discussing Second Bradfute Rep. at 1–2). But the results

of this BLAST search showed the two proteins had "no significant history," which was incorrect. *Id.* (citing Second Bradfute Rep. at 2).

Petitioner also maintains that he has satisfied both the second and third prongs. Br. at 36–41. (His arguments supporting these aspects of his claim are more succinct, and mostly rely on his experts' opinions and circumstantial evidence about a lack of other explanations or the sheer temporal association between vaccination and Petitioner's onset). *See id.*

On Reply, Petitioner insists that the tetanus vaccine can cause GBS, that he has satisfied his requisite showing for entitlement, and that Respondent cannot carry his burden of establishing the existence of a causal "factor unrelated." *See* Reply at 6–23. Petitioner again points to prior decisions from Special Masters where entitlement was found in favor of Petitioner for tetanus-GBS claims. Reply at 3–6. (discussing *Harris*, 2023 WL 2583393; *Mohamad*, 2022 WL 711604. Other decisions referenced were examples of special masters granting entitlement to petitioners for claims of demyelinating disorders from HPV vaccines. *Id.* at 3–6 (discussing *Harmon v. Sec'y of Health & Hum. Servs.*, No. 12-298V, 2017 WL 2872293 (Fed. Cl. Spec. Mstr. Jun. 16, 2017) at *24 (finding entitlement to compensation for central nervous system demyelinating disorder secondary to HPV immunization where petitioner identified sequence similarities); *D.S. v. Sec'y of Health & Hum. Servs.*, No. 10-77, 2015 WL 8409472 (Fed. Cl. Spec. Mstr. May 19, 2015)).

In response to Respondent's criticism's about his causation argument, Petitioner asserts the evidence provided satisfies the Program's entitlement standard. *See* Reply at 6–12. Dr. Bradfute put forward self-searched sequence homology results confirming regions of structural sequences—which is a more effective tool to identify regions of homology between proteins than BLAST searches. *Id.* at 7. Petitioner argues that this evidence, coupled with Dr. Bradfute's cited articles that support a causal relationship between the HPV vaccine and GBS, satisfy his preponderance standard and obviates the need for direct evidence of molecular mimicry. *Id.* at 6–12.

*Respondent*

Respondent contends that the Petitioner has failed his requisite showing on all three *Althen* prongs. First, he maintains the initial *Althen* "can cause" prong is not met. Opp. at 13–18. Petitioner failed to put forward compelling evidence of a specific causal theory, and failed to show concrete scientific evidence or expert testimony to support his argument. *See* Opp. at 13. It is not sufficient to show that *other* vaccines have been associated with GBS to establish a causal effect with an unrelated vaccine. *Id.*

Petitioner and his experts seem to espouse multiple theories about how vaccines could cause GBS, but without tying these theories to Petitioner's specific vaccines or injury. *See id.* at 13–14 (discussing First Santoro Rep. at 10–12). Respondent noted that Petitioner's causation theory ultimately relies heavily on molecular mimicry, however (specifically associated with the

HPV vaccine, given Dr. Bradfute's reports). Opp. at 15–16. But it remained the case that generally-accepted criteria (addressed by Dr. MacGinnitie) for applying molecular mimicry in an autoimmune disease context had not been satisfied). *Id.* (citing First MacGinnitie Rep. at 6; Rojas at 103). Petitioner failed to show homology between relevant vaccine components and proteins associated with GBS, had not put forward epidemiological evidence or animal models causally connecting the vaccines to GBS, and had not specified the likely relevant cross-reactive T-cells or antibodies. *Id.* at 15–18.

At the same time, studies offered as evidence in this matter have shown no association between the vaccines at issue and GBS. Opp. at 16–18. Large studies involving millions of doses of the meningococcal vaccine found no confirmed increase of GBS. *Id.* at 16–17 (discussing Velentgas at 1355–57; Yih 2012 at 1359). The author of Yih 2012 even reported that there were *no* confirmed cases of post-meningococcal vaccine GBS in cohort studies. *Id.* at 17 (quoting Yih 2012 at 1359). Similar findings were noted for epidemiologic studies regarding HPV and tetanus toxoid-containing vaccines. *Id.* at 17 (discussing Andrews at 1730–31; Gee at 5757–58; Tuttle at 2048 (large studies of millions of vaccines found that the number of GBS cases post-receipt of tetanus toxoid-containing vaccines was "less than the number expected by chance alone").

Petitioner also failed to meet the other two *Althen* prongs, Respondent argued. Opp. at 18–22. Petitioner has not shown a logical sequence of cause and effect between his vaccinations and GBS. *Id.* at 18. Petitioner's argument that simply because there was no other explanation for what would have caused his GBS symptoms than only the vaccines could explain it was logically flawed. *Id.* Although GBS can occur after an infection, it can also happen with no clear antecedent event. *Id.* (citing Kruer Rep. at 5). Petitioner's treaters also never attributed his GBS to his vaccines. *Id.* at 19 (citing Ex. 2 at 32, 44, 65; Ex. 3 at 7, 11; Ex. 5 at 124). And there was no demonstrated meaningful temporal association between the vaccines Petitioner received and the onset of his symptoms, since (given that prong one causation had not been demonstrated), it could not also be shown that there was *any* possible medically-acceptable timeframe for onset. *Id.* at 20–22.

## V. Applicable Law

### A. *Petitioner's Overall Burden in Vaccine Program Cases*

To receive compensation in the Vaccine Program, a petitioner must prove either: (1) that he suffered a "Table Injury"—i.e., an injury falling within the Vaccine Injury Table—corresponding to one of the vaccinations in question within a statutorily prescribed period of time or, in the alternative, (2) that his illnesses were actually caused by a vaccine (a "Non-Table Injury"). *See* Sections 13(a)(1)(A), 11(c)(1), and 14(a), as amended by 42 C.F.R. § 100.3; § 11(c)(1)(C)(ii)(I); *see also Moberly ex rel. Moberly v. Sec'y of Health & Hum. Servs.,* 592 F.3d

1315, 1321 (Fed. Cir. 2010); *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1320 (Fed. Cir. 2006).[16] There is no Table claim for GBS caused by any of the three vaccines at issue (although all are covered under the Vaccine Program).

For both Table and Non-Table claims, Vaccine Program petitioners bear a "preponderance of the evidence" burden of proof. Section 13(1)(a). That is, a petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly*, 592 F.3d at 1322 n.2; *see also Snowbank Enter. v. United States*, 6 Cl. Ct. 476, 486 (1984) (mere conjecture or speculation is insufficient under a preponderance standard). Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Hum. Servs.*, 931 F.2d 867, 873 (Fed. Cir. 1991). In particular, a petitioner must demonstrate that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321 (quoting *Shyface v. Sec'y Health & Hum. Servs.*, 165 F.3d 1344, 1352–53 (Fed.Cir.1999)); *Pafford v. Sec'y of Health & Hum. Servs*., 451 F.3d 1352, 1355 (Fed. Cir. 2006). A petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. Section 13(a)(1).

In attempting to establish entitlement to a Vaccine Program award of compensation for a Non-Table claim, a petitioner must satisfy all three of the elements established by the Federal Circuit in *Althen*, 418 F.3d at 1278: "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury."

Each of the *Althen* prongs requires a different showing. Under *Althen* prong one, petitioners must provide a "reputable medical theory," demonstrating that the vaccine received *can cause* the type of injury alleged. *Pafford*, 451 F.3d at 1355–56 (citations omitted). To satisfy this prong, a petitioner's theory must be based on a "sound and reliable medical or scientific explanation." *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 548 (Fed. Cir. 1994). Such a theory must only be "legally probable, not medically or scientifically certain." *Id.* at 549.

Petitioners may satisfy the first *Althen* prong without resort to medical literature, epidemiological studies, demonstration of a specific mechanism, or even a generally accepted medical theory. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1378–79 (Fed.Cir.2009)

---

[16] Decisions of special masters (some of which I reference in this ruling) constitute persuasive but not binding authority. *Hanlon v. Sec'y of Health & Hum. Servs.*, 40 Fed. Cl. 625, 630 (1998). By contrast, Federal Circuit rulings concerning legal issues are binding on special masters. *Guillory v. Sec'y of Health & Hum. Servs.*, 59 Fed. Cl. 121, 124 (2003), *aff'd* 104 F. Appx. 712 (Fed. Cir. 2004); *see also Spooner v. Sec'y of Health & Hum. Servs.*, No. 13-159V, 2014 WL 504728, at *7 n.12 (Fed. Cl. Spec. Mstr. Jan. 16, 2014).

(citing *Capizzano*, 440 F.3d at 1325–26). Special masters, despite their expertise, are not empowered by statute to conclusively resolve what are essentially thorny scientific and medical questions, and thus scientific evidence offered to establish *Althen* prong one is viewed "not through the lens of the laboratorian, but instead from the vantage point of the Vaccine Act's preponderant evidence standard." *Id.* at 1380. Accordingly, special masters must take care not to increase the burden placed on petitioners in offering a scientific theory linking vaccine to injury. *Contreras v. Sec'y of Health & Hum. Servs*, 121 Fed. Cl. 230, 245 (2015), *vacated and remanded*, 844 F.3d 1363 (Fed. Cir. 2017).

In discussing the evidentiary standard applicable to the first *Althen* prong, the Federal Circuit has consistently rejected the contention that it can be satisfied merely by establishing the proposed causal theory's scientific or medical *plausibility*. *See Cerrone v. Sec'y of Health & Hum. Servs.*, 146 F.4th 1113, 1121 (Fed. Cir. 2025) (the argument that *Althen* prong one requires only a showing of plausibility "understates the burden [a petitioner] bears under the first factor in the *Althen* formulation"); *Kalajdzic v. Sec'y of Health & Hum. Servs.*, No. 2023-1321, 2024 WL 3064398, at *2 (Fed. Cir. June 20, 2024) (arguments "for a less than preponderance standard" deemed "plainly inconsistent with our precedent" (*citing Moberly*, 592 F.3d at 1322)); *Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1359 (Fed. Cir. 2019); *see also Howard v. Sec'y of Health & Hum. Servs.*, 2022 WL 4869354 (Fed. Cl. Spec. Mstr. Aug. 31, 2022), *mot. for review den'd,* 2023 WL 4117370, at *4 (Fed. Cl. May 18, 2023) ("[t]he standard has been preponderance for nearly four decades"), *aff'd*, 2024 WL 2873301 (Fed. Cir. June 7, 2024) (unpublished). And petitioners always have the ultimate burden of establishing their *overall* Vaccine Act claim with preponderant evidence. *W.C. v. Sec'y of Health & Hum. Servs.*, 704 F.3d 1352, 1356 (Fed. Cir. 2013) (citations omitted); *Tarsell v. United States*, 133 Fed. Cl. 782, 793 (2017) (noting that *Moberly* "addresses the petitioner's overall burden of proving causation-in-fact under the Vaccine Act" by a preponderance standard).

The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a petitioner's medical records. *Althen*, 418 F.3d at 1278; *Andreu*, 569 F.3d at 1375–77; *Capizzano*, 440 F.3d at 1326; *Grant v. Sec'y of Health & Hum. Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992). In establishing that a vaccine "did cause" injury, the opinions and views of the injured party's treating physicians are entitled to some weight. *Andreu*, 569 F.3d at 1367; *Capizzano*, 440 F.3d at 1326 ("medical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury'") (quoting *Althen*, 418 F.3d at 1280). Medical records are generally viewed as particularly trustworthy evidence, since they are created contemporaneously with the treatment of the patient. *Cucuras v. Sec'y of Dept. of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Medical records and statements of a treating physician, however, do not *per se* bind the special master to adopt the conclusions of such an individual, even if they must be considered and carefully evaluated. Section 13(b)(1) (providing that "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court"); *Snyder v. Sec'y of Health & Hum. Servs*., 88 Fed. Cl. 706, 746 n.67 (2009) ("there is nothing . . . that mandates that the testimony of a treating physician is sacrosanct—that it must be accepted in its entirety and cannot be rebutted"). As with expert testimony offered to establish a theory of causation, the opinions or diagnoses of treating physicians are only as trustworthy as the reasonableness of their suppositions or bases. The views of treating physicians should be weighed against other, contrary evidence also present in the record—including conflicting opinions among such individuals. *Hibbard v. Sec'y of Health & Hum. Servs.*, 100 Fed. Cl. 742, 749 (2011) (not arbitrary or capricious for special master to weigh competing treating physicians' conclusions against each other), *aff'd*, 698 F.3d 1355 (Fed. Cir. 2012); *Veryzer v. Sec'y of Dept. of Health & Hum. Servs.*, No. 06-522V, 2011 WL 1935813, at *17 (Fed. Cl. Spec. Mstr. Apr. 29, 2011), *mot. for review den'd*, 100 Fed. Cl. 344, 356 (2011), *aff'd without opinion*, 475 F. Appx. 765 (Fed. Cir. 2012).

The third *Althen* prong requires establishing a "proximate temporal relationship" between the vaccination and the injury alleged. *Althen*, 418 F.3d at 1281. That term has been equated to the phrase "medically-acceptable temporal relationship." *Id.* A petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation." *de Bazan v. Sec'y of Health & Hum. Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). The explanation for what is a medically acceptable timeframe must align with the theory of how the relevant vaccine can cause an injury (*Althen* prong one's requirement). *Id.* at 1352; *Shapiro v. Sec'y of Health & Hum. Servs.*, 101 Fed. Cl. 532, 542 (2011), *recons. den'd after remand*, 105 Fed. Cl. 353 (2012), *aff'd mem.*, 503 F. Appx. 952 (Fed. Cir. 2013); *Koehn v. Sec'y of Health & Hum. Servs.*, No. 11-355V, 2013 WL 3214877 (Fed. Cl. Spec. Mstr. May 30, 2013), *mot. for rev. den'd* (Fed. Cl. Dec. 3, 2013), *aff'd*, 773 F.3d 1239 (Fed. Cir. 2014).

B. *Legal Standards Governing Factual Determinations*

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records. Section 11(c)(2). The special master is required to consider "all [ ] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as the "results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." Section 13(b)(1)(A). The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir.

1993) (determining that it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is evidenced by a rational determination).

As noted by the Federal Circuit, "[m]edical records, in general, warrant consideration as trustworthy evidence." *Cucuras*, 993 F.2d at 1528; *Doe/70 v. Sec'y of Health & Hum. Servs.*, 95 Fed. Cl. 598, 608 (2010) ("[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), *aff'd*, *Rickett v. Sec'y of Health & Hum. Servs*., 468 F. App'x 952 (Fed. Cir. 2011) (non-precedential opinion). A series of linked propositions explains why such records deserve some weight: (i) sick people visit medical professionals; (ii) sick people attempt to honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in as accurate a manner as possible, so that they are aware of enough relevant facts to make appropriate treatment decisions. *Sanchez v. Sec'y of Health & Hum. Servs.*, No. 11–685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013); *Cucuras*, 993 F.2d at 1528 ("[i]t strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms").

Accordingly, if the medical records are clear, consistent, and complete, then they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs*., No. 03–1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). Indeed, contemporaneous medical records are often found to be deserving of greater evidentiary weight than oral testimony—especially where such testimony conflicts with the record evidence. *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Hum. Servs*., 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992), *cert. den'd*, *Murphy v. Sullivan*, 506 U.S. 974 (1992) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1947) ("[i]t has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight.")).

However, the Federal Circuit has also noted that there is no formal "presumption" that records are accurate or superior on their face to other forms of evidence. *Kirby v. Sec'y of Health & Hum. Servs.,* 997 F.3d 1378, 1383 (Fed. Cir. 2021). There are certainly situations in which compelling oral or written testimony (provided in the form of an affidavit or declaration) may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health & Hum. Servs*., 69 Fed. Cl. 775, 779 (2006) ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie*, 2005 WL 6117475, at *19 ("[w]ritten records which are, themselves, inconsistent, should be accorded less

deference than those which are internally consistent") (quoting *Murphy*, 23 Cl. Ct. at 733)). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be afforded. *Andreu*, 569 F.3d at 1379; *Bradley v. Sec'y of Health & Hum. Servs*., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

When witness testimony is offered to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Sanchez*, 2013 WL 1880825, at *3 (citing *Blutstein v. Sec'y of Health & Hum. Servs*., No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs*., 110 Fed. Cl. 184, 203–04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). In making a determination regarding whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony at hearing, there must be evidence that this decision was the result of a rational determination. *Burns*, 3 F.3d at 417.

C. *Analysis of Expert Testimony*

Establishing a sound and reliable medical theory often requires a petitioner to present expert testimony in support of his claim. *Lampe v. Sec'y of Health & Hum. Servs*., 219 F.3d 1357, 1361 (Fed. Cir. 2000). Vaccine Program expert testimony is usually evaluated according to the factors for analyzing scientific reliability set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594–96 (1993). *See Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1339 (Fed. Cir. 2010) (citing *Terran v. Sec'y of Health & Hum. Servs.*, 195 F.3d 1302, 1316 (Fed. Cir. 1999). Under *Daubert*, the factors for analyzing the reliability of testimony are:

> (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards for controlling the error; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community.

*Terran*, 195 F.3d at 1316 n.2 (citing *Daubert*, 509 U.S. at 592–95).

In the Vaccine Program the *Daubert* factors play a slightly different role than they do when applied in other federal judicial settings, like the district courts. Typically, *Daubert* factors are

employed by judges (in the performance of their evidentiary gatekeeper roles) to exclude evidence that is unreliable or could confuse a jury. By contrast, in Vaccine Program cases these factors are used in the *weighing* of the reliability of scientific evidence proffered. *Davis v. Sec'y of Health & Hum. Servs*., 94 Fed. Cl. 53, 66–67 (2010) ("uniquely in this Circuit, the *Daubert* factors have been employed also as an acceptable evidentiary-gauging tool with respect to persuasiveness of expert testimony already admitted"). The flexible use of the *Daubert* factors to evaluate the persuasiveness and reliability of expert testimony has routinely been upheld. *See*, *e.g.*, *Snyder*, 88 Fed. Cl. at 742–45. In this matter (as in numerous other Vaccine Program cases), *Daubert* has not been employed at the threshold, to determine what evidence should be admitted, but instead to determine whether expert testimony offered is reliable and/or persuasive.

Respondent frequently offers one or more experts in order to rebut a petitioner's case. Where both sides offer expert testimony, a special master's decision may be "based on the credibility of the experts and the relative persuasiveness of their competing theories." *Broekelschen v. Sec'y of Health & Hum. Servs*., 618 F.3d 1339, 1347 (Fed. Cir. 2010) (citing *Lampe*, 219 F.3d at 1362). However, nothing requires the acceptance of an expert's conclusion "connected to existing data only by the *ipse dixit* of the expert," especially if "there is simply too great an analytical gap between the data and the opinion proffered." *Snyder*, 88 Fed. Cl. at 743 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 146 (1997)); *see also Isaac v. Sec'y of Health & Hum. Servs*., No. 08–601V, 2012 WL 3609993, at *17 (Fed. Cl. Spec. Mstr. July 30, 2012), *mot. for review den'd*, 108 Fed. Cl. 743 (2013), *aff'd*, 540 F. App'x 999 (Fed. Cir. 2013) (citing *Cedillo*, 617 F.3d at 1339). Weighing the relative persuasiveness of competing expert testimony, based on a particular expert's credibility, is part of the overall reliability analysis to which special masters must subject expert testimony in Vaccine Program cases. *Moberly*, 592 F.3d at 1325–26 ("[a]ssessments as to the reliability of expert testimony often turn on credibility determinations"); *see also Porter v. Sec'y of Health & Hum. Servs*., 663 F.3d 1242, 1250 (Fed. Cir. 2011) ("this court has unambiguously explained that special masters are expected to consider the credibility of expert witnesses in evaluating petitions for compensation under the Vaccine Act").

D. *Consideration of Medical Literature*

Both parties filed numerous items of medical and scientific literature in this case, but not all such items factor into the outcome of this decision. While I have reviewed all the medical literature submitted in this case, I discuss only those articles that are most relevant to my determination and/or are central to Petitioner's case—just as I have not exhaustively discussed every individual medical record filed. *Moriarty v. Sec'y of Health & Hum. Servs.*, No. 2015–5072, 2016 WL 1358616, at *5 (Fed. Cir. Apr. 6, 2016) ("[w]e generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his decision") (citation omitted); *see also Paterek v. Sec'y of Health & Hum. Servs.,* 527 F.

App'x 875, 884 (Fed. Cir. 2013) ("[f]inding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered").

E. *Determination to Resolve Case without a Hearing*

I have opted to decide entitlement in this case based on written submissions and evidentiary filings, including the expert reports filed by each side. The Vaccine Act and Rules not only contemplate but encourage special masters to decide petitions on the papers rather than via evidentiary hearing, where (in the exercise of their discretion) they conclude that the former means of adjudication will properly and fairly resolve the case. Section 12(d)(2)(D); Vaccine Rule 8(d). The choice to do so has been affirmed on appeal. *See D'Toile v. Sec'y of Health & Human Servs.*, No. 15-85V, 2018 WL 1750619, at *2 (Fed. Cir. Apr. 12, 2018); *see also Hooker v. Sec'y of Health & Human Servs.*, No. 02-472V, 2016 WL 3456435, at *21 n.19 (Fed. Cl. Spec. Mstr. May 19, 2016) (citing numerous cases where special masters decided on the papers in lieu of hearing and that decision was upheld). I am simply not required to hold a hearing in every matter, no matter the preferences of the parties. *See Hovey v. Sec'y of Health & Human Servs.*, 38 Fed. Cl. 397, 402–03 (1997) (special master acted within his discretion in denying evidentiary hearing); *Burns*, 3 F.3d at 417.

## ANALYSIS

### I. Overview of GBS and its Treatment in Prior Program Cases

The parties agree that Mr. Harmon experienced GBS. But some discussion of the condition's features will still be helpful in resolving causation. GBS has been defined as an acute, monophasic peripheral neuropathy involving rapidly-progressive and ascending weakness and paralysis, and which is thought to have an autoimmune mechanism. L. Martin Arias et al., *Guillain-Barré Syndrome and Influenza Vaccines: A Meta-Analysis*, 33 Vaccine 3773 (2015), filed as Ex. 55 (ECF No. 41-11). It usually presents with numbness, paresthesia, or weakness in the limbs. S. Sudulagunta et al., *Guillain-Barré Syndrome: Clinical Profile and Management*, 13 Ger. Med. Sci. 1, 3 tbl. 1 (2015), filed as Ex. 17 (ECF No. 39-2).

Reliable scientific evidence supports the conclusion that GBS can be vaccine-caused—specifically by the flu vaccine. Consistent with this, a large body of reasoned Program decisions[17] recognize an association between the flu vaccine and GBS (as well as other related peripheral neuropathies). Indeed, there is a Table claim for GBS due to receipt of a flu vaccine. 42 C.F.R. §

[17] Although prior decisions from different cases do not control the outcome herein, special masters may reasonably take into account, for guidance, the logic of such reasoned determinations. In fact, it is wise to do so, given how often similar causation theories or fact patterns arise in Vaccine Program cases.

100.3.14. This means the Government accepts that sufficiently-probative and reliable science on the topic exists to justify conceding causation, at least for Program purposes. *Haskins v. Sec'y of Health & Hum. Servs.*, No. 18-1776V, WL 2020 1870279 (Fed. Cl. Spec. Mstr. Mar. 13, 2019). Even in cases where a Table element for such a claim cannot be met (for example, when onset is too short or too long to fit within the timeframe of 3–42 days set for the claim), any subsequent causation-in-fact analysis performed by the special masters rarely requires the claimant to offer proof in support of the first *Althen* prong, "can cause" element; instead, it is reasonably assumed to be satisfied already. *See Welch v. Sec'y of Health & Hum. Servs*. No. 18-494V, 2019 WL 349360 (Fed. Cl. Spec. Mstr. July 2, 2019).

Other vaccines have also been found causal of GBS, although there is disagreement among the special masters as to the preponderant strength of these proposed associations. *See, e.g.*, *Gross v. Sec'y of Health & Hum. Servs.*, No. 17-1075, 2022 WL 9669651, at *36–37 (Fed. Cl. Spec. Mstr. Sept. 22, 2022) (finding the pneumococcal vaccine caused GBS); *but see Trollinger v. Sec'y of Health & Hum. Servs.*, No. 16-473V, 2023 WL 2521912, at *30 (Fed. Cl. Spec. Mstr. Feb. 17, 2023), *mot. for review den'd*, 167 Fed. Cl. 127 (2023) (holding that the pneumococcal vaccine was not shown to cause GBS); *Bielak v. Sec'y of Health & Hum. Servs.*, No. 18-761V, 2022 WL 18058244, at *3 (Fed. Cl. Spec. Mstr. Dec. 9, 2022) (same). It thus cannot be said that the Program has developed a consistent view as to what the science preponderantly "says" about causation of GBS when the flu vaccine is not involved. Instead, it appears that the outcome in such cases is mostly a function of the evidence before the special master (along with a special master's individual views about the applicability of causation theories to different vaccines), with no clear trend one way or the other.

*GBS and Tdap*

A number of well-reasoned cases decided in the past ten years (some of which I authored) found no causal association between GBS and Tdap or tetanus toxoid-containing vaccines.[18] *See, e.g.*, *Kaczerowski v. Sec'y of Health & Hum. Servs.,* No. 21-758V, 2025 WL 2798865, at *29–38 (Fed. Cl. Spec. Mstr. Aug. 28, 2025); *Dennington v. Sec'y of Health & Hum. Servs.*, No. 18-1303V, 2023 WL 2965239 (Fed. Cl. Spec. Mstr. Apr. 17, 2023), *mot. for review den'd*, 167 Fed. Cl. 640 (2023), *appeal dismissed,* No. 2024-1214, 2024 WL 1255318 (Fed. Cir. Mar. 25, 2024); *Montgomery v. Sec'y of Health & Hum. Servs.*, No. 15-1037V, 2019 WL 2511352 (Fed. Cl. Spec. Mstr. May 21, 2019); *Tompkins v. Sec'y of Health & Hum. Servs.*, No. 10-261V, 2013 WL

[18] I have also decided a few cases in which I determined that a petitioner failed to establish a causal association between the Tdap vaccine and CIDP—a different injury from GBS, although also still a peripheral neuropathy (and Program claimants frequently rely on GBS-specific evidence in arguing that a vaccine can cause CIDP). *See, e.g.*, *DeVaughn v. Sec'y of Health & Hum. Servs.*, No. 22-832V, 2025 WL 758128 (Fed. Cl. Spec. Mstr. Feb. 10, 2025); *Howard*, 2022 WL 4869354 at *26; *Sanchez v. Sec'y of Health & Hum. Servs.*, No. 18-1012V, 2022 WL 1013264, at *1 (Fed. Cl. Spec. Mstr. Mar. 11, 2022).

3498652 (Fed. Cl. Spec. Mstr. June 21, 2013), *mot. for review den'd*, 117 Fed. Cl. 713 (2014); *Isaac*, 2012 WL 3609993 at 19.

Admittedly, some special masters have deemed causation demonstrated in Tdap vaccine-GBS cases. *See Harris*, 2023 WL 2583393; *Mohamad*, 2022 WL 711604, at *18. In *Mohamad*, a special master ruled in a petitioner's favor in a Tdap-GBS case, but almost wholly based on the determination that the Government had effectively conceded the first *Althen* Prong. In particular, the special master observed that (a) in 2011, the IOM had noted a precaution to receipt of the Tdap vaccine in the future if an immunized individual had developed GBS within six weeks of a prior dose, and (b) this precaution note (along with an acknowledgment of the possibility of encephalopathy in a seven-day timeframe) had been maintained in subsequent ACIP reports, despite interim findings that the tetanus-GBS link was not as well-established as previously thought. *Mohamad,* 2022 WL 711604, at *13–15. From this (and also due to credibility determinations specific to the experts who had testified in that case), the special master concluded that the first *Althen* prong was satisfied. *Id.* at *7, 15–18.

As I have noted in other cases, however, the argument that the sequence of governmental publications over time discussing GBS as a possible adverse event from receipt of the Tdap vaccine, coupled with treatment advice against giving it *again* to a person who previously also experienced Tdap vaccine-associated GBS, does not amount to persuasive proof that the Government "knows" there is causal association. *Kaczerowski,* 2025 WL 2798865, at *34. And efforts to broadly apply the same thinking applicable to the flu vaccine and GBS to all other covered vaccines are not sufficient either. Instead, a claimant seeking to prove the Tdap vaccine caused an individual's GBS needs to offer some overall combination of proof with *some specificity* to the Tdap vaccine's components, rather than analogizing to the flu vaccine. This showing must be *preponderantly* established—not simply that it is *biologically plausible* a vaccine could impact the immune system in such a way that it could lead to an autoimmune demyelinating disease, but that it *likely* does so.

*GBS and HPV Vaccine*

A relatively small number of cases in the Program have addressed whether the HPV vaccine can cause GBS. One of the earlier matters found in favor of a petitioner, accepting an expert opinion that the HPV vaccine "can cause" GBS, although there was no published medical literature demonstrating homology. *Salmins v. Sec'y of Health & Hum. Servs.,* No. 11-140V, 2014 WL 1569478, at *14 (Fed. Cl. Spec. Mstr. Mar. 31, 2014); *see also White v. Sec'y of Health & Hum. Servs.*, No. 15-1521V, 2019 WL 7563239, at *24 (Fed. Cl. Dec. 19, 2019) (finding the Petitioner satisfied *Althen* prong one for a HPV-transverse myelitis claim with a BLAST result showing of 5 of 11 amino acids were identical between human papilloma virus and myelin basic protein).

More recent decisions, however, have denied entitlement for such claims—demanding more evidence than an expert's say so. *See, e.g., Vega v. Sec'y of Health & Hum. Servs.*, No. 21-1794V, 2026 WL 1088526, at *14–17 (Fed. Cl. Spec. Mstr. Mar. 25, 2026); *Blackburn v. Sec'y of Health & Hum. Servs.*, No. 10-410V, 2015 WL 425935, at *28–30 (Fed. Cl. Spec. Mstr. Jan. 9, 2015). In *Blackburn*, I found the molecular mimicry theory presented by the petitioner was not substantiated with sufficient evidence of a causative mechanism between the HPV vaccine and GBS. *Blackburn*, 2015 WL 425935 at *30. *Vega* was similar. *Vega,* 2026 WL 1088526, at *17. The petitioner in that case only generally discussed the theory of molecular mimicry but provided few specifics, while epidemiologic evidence was lacking. *Id.* at *16–17. Other cases have reached a similar outcome. *See Montgomery v. Sec'y of Health & Hum. Servs.*, No. 15-1037V, 2019 WL 2511352, at *4 (Fed. Cl. Spec. Mstr. May 21, 2019) (epidemiological evidence did not support a finding that the HPV vaccine increases incidence of GBS); *Burchett v. Sec'y of Health and Hum. Servs.*, No. 12-119V, 2014 WL 2465194, at *11 (Fed. Cl. Spec. Mstr. May 13, 2014) (noting no theory from treating physicians for how HPV vaccine could cause GBS).

*GBS and Meningococcal Vaccine*

There are even fewer cases in Program history where claimants have attempted to show the meningococcal vaccine can cause GBS. I recently had the occasion to address the theory, however, and found it was not preponderantly established. *Gatto v. Sec'y of Health & Hum. Servs.,* No. 21-924V, 2025 WL 972817, at *20–22 (Fed. Cl. Spec. Mstr. Feb. 28, 2025). The petitioner's experts in *Gatto* relied on little more than a homology search and some amino acid sequence similarity between the vaccine and self-proteins to bulwark the theory. *Id.* at *20. And I noted in *Gatto* similarities between arguments about the meningococcal and pneumococcal vaccines, since both are formulated to provide immunity from bacterial infections (and therefore reasoning applicable in rejecting a pneumococcal vaccine-GBS association applies in the context of the meningococcal vaccine as well).

Admittedly, a special master nearly 20 years ago found in favor of a petitioner in this context. *Whitener v. Sec'y of Health & Hum. Servs.*, No. 06-477V, 2009 WL 3007380 (Fed. Cl. Spec. Mstr. Sep. 2, 2009). Causation was demonstrated under the first Althen prong in that instance because of a reference to a report that provided at least an "incidental association." *Id.* at *20. However, this reasoning was later questioned in another case. *See Tompkins v. Sec'y of Health & Hum. Servs*., No. 10-271V, 2013 WL 3498652 at *26 (Fed. Cl. Spec. Mstr. June 21, 2013).

## II. Petitioner Has not Carried His Burden of Proof

It is understood in the Vaccine Program that because claimants must preponderantly establish all three *Althen* prongs to receive damages, special masters need only evaluate those

causation elements relevant to a denial of entitlement. *Dobrydnev v. Sec'y of Health & Hum. Servs*., 566 Fed. Appx. 976, 980 (Fed. Cir. 2014). Here, I find the first *Althen* prong has not been satisfied (and that failure alone is grounds for denying entitlement).

A. General Deficiencies in Petitioner's Causation Theory

Although Petitioner's experts allowed for more general explanations for his GBS due to the immune-stimulative impact of the three vaccines he received, Dr. Bradfute ultimately seems to have favored a common mechanism seen in many Program cases—molecular mimicry (here, almost exclusively due to the HPV vaccine). But in many of the aforementioned cases involving vaccines other than the flu vaccine, I have criticized overreliance on this mechanism, where it is invoked but not coupled with sufficient bulwarking evidence to support the conclusion that it is "more likely than not" this mechanism[19] explains how a vaccine would cause GBS.

Dr. Bradfute's opinion follows the usual path of arguments about molecular mimicry, but then succumbs to the pitfalls so often common to when this reasoning is applied to cases not involving the flu vaccine. Thus, he begins by identifying some vaccine component sequential similarity between the three vaccines and a putative GBS myelin antigenic target, finding it with respect solely the Tdap and HPV vaccines—so far so good, although not enough by itself to prevail. But Dr. MacGinnitie evaluated Dr. Bradfute's findings and could not replicate them. Dr MacGinnitie was unable to find meaningful sequence similarity within the homologies that Dr. Bradfute identified, and could not find evidence that the peptides identified by Dr. Bradfute would actually bind to MCH II molecules. And Dr. MacGinnitie noted problems in this case with embracing molecular mimicry without also showing that it was applicable from the perspective of medical science.[20]

There were several other general deficiencies in Dr. Bradfute's reliance on molecular mimicry. For example, Dr. Bradfute proposed that T helper cells (which aid B cells in the subsequent production of antibodies) were the critical factor in the pathogenesis of GBS, and at the myelin antigenic situs that was similar to certain HPV protein components. First Bradfute Rep.

---

[19] Although claimants are not required to prove a mechanism to prevail, when they attempt to do so (as here), it is reasonable for a special master to evaluate their success. *See, e.g., Diponziano v. Sec'y of Health & Hum. Servs.*, No. 17-1130V, 2025 WL 942744, at *18 (Fed. Cl. Spec. Mstr. Feb. 11, 2025) (citing *Knudsen*, 35 F.3d 548–49)).

[20] Petitioner correctly observes, in the context of the criteria from Rojas that Dr. MacGinnitie discussed, that these criteria are not literally things a claimant *must* satisfy to meet his preponderant showing. Nevertheless, and as I have observed in prior cases, they are relevant factors that medical and scientific experts *would take into account* when evaluating if molecular mimicry is an applicable mechanism for explaining an autoimmune process due to some specific environmental factor—and the absence of evidence to satisfy one or more of them can explain an expert view doubting the utility of molecular mimicry in a particular case. *Cerrone v. Sec'y of Health & Hum. Servs.*, No. 17-1158V, 2023 WL 3816718, at *26 (Fed. Cl. Spec. Mstr. June 1, 2023), *rev. denied, decision aff'd*, 168 Fed. Cl. 745 (2023), *aff'd*, 146 F.4th 1113 (Fed. Cir. 2025).

at 2–4. But this goes against countless Program decisions that turn on a claimant's success in showing that *antibodies* (not T cells in any form) are what drive this form of autoimmune disease in the wake of vaccination. And why is this? For the simple reason that vaccines are consistently engineered *specifically* to result in antibody production. *See* IOM Rep. at 68; Shoenfeld at 11. Although the immune system may later, secondarily, develop or "train" specific the T cells more directly responsible for attacking foreign antigens to aid in that process, and while that may occur in the wake of vaccination, vaccines themselves do not instigate directly that process (and if they did, they would be effective antiviral or bacterial treatments useful in the arrest of live infectious processes making a person ill, rather than prophylactic modality they represent).
*See generally* IOM Rep. at 57–60.

This case also features the kind of arguments experts routinely make on behalf of petitioners when they cannot otherwise identify enough evidence to fill out their prong one showing. For example, Dr. Santoro offered common arguments about the defensibility of reliance on case reports as having "some" evidentiary value. *See* Second Santoro Rep. at 2–3. The Program recognizes this. *See, e.g., Langert v. Sec'y of Health & Hum. Servs.,* No. 22-809V, 2025 WL 1892418, at *8 fn. 9 (Fed. Cl. Spec. Mstr. June 13, 2025). But it *also* recognizes that case reports warrant low weight in establishing causation. *See id.* A claimant is unlikely to meet his preponderant burden on the basis of case report citations alone. VAERS passive surveillance evidence is equally deserving of little evidentiary weight. *See Bickel v. Sec'y of Health & Hum. Servs.*, No. 21-867V, 2026 WL 459103, at *8 (Fed. Cl. Spec. Mstr. Jan. 23, 2026).

In addition, there is ample large-scale epidemiologic evidence undercutting causation with respect to *all* of the implicated vaccines. *See generally* Top; Hughes; Gee; Velentgas; Andrews; Yih 2012; Arnheim-Dahlstrom. In response, Petitioner's experts maintain (like other Program claimants attempting to address this category of evidence) that such studies should either be ignored (since precedent says petitioners are not *compelled* to offer this form of proof to prevail) or deemed weak evidence (since no study can conclusively rule out vaccine causation, especially for rare illnesses). But both arguments have repeatedly been dispensed with in prior persuasive or precedentially-controlling decisions. The fact that epidemiologic evidence is not *required* of a claimant does not render it *irrelevant*, or prevent Respondent from citing it to rebut Petitioner' causation showing.[21] *Crutchfield v. Sec'y of Health & Human Servs.,* No. 09-0039V, 2014 WL

[21] Some special masters have come dangerously close to assuming the irrelevance of legitimate, rebutting epidemiologic evidence, or dismissing an expert's reliance on it as misguided. *See,* e.g., *Gillon v. Sec'y of Health & Hum. Servs.*, No. 21-752V, 2026 WL 926134, at *13 (Fed. Cl. Spec. Mstr. Feb. 20, 2026) (in case alleging Tdap vaccine could cause GBS, Respondent's experts were found to have erroneously given "dispositive emphasis to the limitations of epidemiology" on the theory, deeming that inconsistent with the fact that "petitioners are not required to produce conclusive or epidemiologic evidence to satisfy the preponderance standard"). But while it may well be correct that epidemiology does not conclusively resolve causation, it is hardly reasonable to reject expert opinions that observe that existing epidemiology does not support causation. (I would view the issue differently if an expert argued that the claimant had not *produced* a favorable epidemiologic study—as that would reflect a requirement that such evidence be offered).

1665227 (Fed. Cl. Spec. Mstr. Apr. 7, 2014), at *15 ("it is not the Respondent's burden in [a] case to prove that it is *impossible* that [the relevant vaccine] can cause [the alleged injury]. It is, rather, the *Petitioner's burden* to [show the vaccine can cause the injury]") (emphasis in original), *mot. for review den'd*, 125 Fed. Cl. 251 (2014).[22] A claimant's inability to lay hands on epidemiology affirmatively supporting his claim—when epidemiology *undermining* it exists—simply illuminates weaknesses in the proposed causation theory. And while the rarity of an injury may impact how much evidence exists on the topic pro or con, it is not a shield that protects claimants from meeting the evidentiary burdens imposed on them by the Vaccine Program.

Besides the more specific aspects of Dr. Bradfute's theory, Dr. Santoro proposed more generally that what "matters" for purposes of causation in GBS is less the specific components to the vaccine at issue than the capacity of any vaccine (especially when received at the same time as others) to interfere with the immune response, resulting in aberrancy and an autoimmune reaction. First Santoro Rep. at 9–11. But this also was not bulwarked with sufficient evidence suggesting it is likely that one, two, or all three of the vaccines at issue are likely to cause an aberrant reaction leading to an autoimmune disease.

Petitioner's experts otherwise offered very little in the way of more recent medical or scientific thinking on how vaccines other than the flu vaccine might cause GBS. Much attention was paid by both of Petitioner's experts to Sukenikova, for example—and it admittedly was more recently published, and is an item of literature I have not encountered before in other cases alleging GBS as a vaccine-associated injury. But Sukenikova is not particularly helpful in bulwarking Petitioner's otherwise-insufficient causation showing.

Putting aside the fact that the article does not involve the capacity of *any* particular vaccine to spark GBS, Sukenikova's observations were specific to a small sample of individuals (15) who *already* had GBS (albeit at different stages), and thus says little, if anything, about initial environmental triggers for the disease process (as vaccines would have to accomplish to be causal). Sukenikova at 161, 167. Indeed, although its findings do suggest some meaningful antigenic targets in myelin linked to both T-helper and regular, "attacking" T cells, Sukenikova noted that for one GBS variant,[23] there was an *absence* of evident autoreactive T cell response at onset, and

---

[22] Respondent has the burden to "rule out" vaccine causation *only* when a claimant has met his prima facie burden, and the burden shifts to Respondent to prove a "factor unrelated" to vaccination caused the relevant injury. *de Bazan*, 539 F.3d at 1354. That shifting has not occurred herein, however.

[23] The relevant variant is "AMAN," or "acute motor axonal neuropathy"—a form involving axon harm rather than simple demyelination. *See* H. Luo, *Clinical Characteristics of Children with Guillain-Barre Syndrome and Factors Associated with Disease Severity,* 92 J. Clin. Neuroscience 120, (2021), filed as Ex. 19 (ECF No. 39-4). Notably (and as Sukenikova's authors acknowledged), molecular mimicry is associated with this form of GBS in the context of a *C. jejuni* infection only, with the mechanisms for *other* forms of post-infectious GBS "unclear." Sukenikova at 167. And as noted above, none of the wild infectious analogs to the three vaccines at issue are themselves well-associated with GBS, and also it is not likely Petitioner's form of GBS was AMAN either.

that the variant at issue was in any event thought to be mediated by autoantibodies rather than T cells (reducing greatly the article's relevance to a theory like Dr. Bradfute's molecular mimicry showing). Thus, despite its recent vintage, Sukenikova does not particularly reflect scientific advances better supporting vaccine causation of GBS.

B. Deficiencies Specific to the Relevant Vaccines

1. *HPV Vaccine*

The most well-substantiated elements of Petitioner's causation theory focused on the HPV vaccine. While Dr. Bradfute was able to identify homologic sequences the HPV vaccine antigens and myelin proteins, on the one hand, and self-structures putatively involved in the myelin targets for attack, on the other, the HPV components "fell out," to some extent, of the subsequent steps of his analysis. *See generally* First Bradfute Rep. at 3–4. As explained above, Dr. MacGinnitie found no evidence that the homologous HPV antigen peptides identified by Dr. Bradfute likely matched myelin-peptides that bind to MCH II alleles that are targets for T cells. Second MacGinnitie Rep. at 4–6. If anything, Dr. Bradfute's search results from the IEDB only found that three vaccine antigens identified *might* be able to bind to the same MHC II allele as the myelin peptides identified. First Bradfute Rep. at 4. A finding that a required part of Petitioner's causation theory is conceivably possible creates a weak foundation for a theory that must be preponderantly established (especially given the other assumptions in the theory—such as the proposition that Petitioner likely possessed the relevant MHC II allele).

In addition, the showing of homologic similarity plus a possibly-significant homologic target was not connected to other supportive scientific/medical evidence. Petitioner could only substantiate the molecular mimicry-based aspects of the theory with a few articles of surveillance data and risk analyses of GBS after the HPV vaccine, all of which only stood for a temporal association rather than causal link. *See* Hu at 5450–51. Respondent, by contrast, offered the Andrews and Gee articles, which are methodologically-robust epidemiologic evidence that supports the view that the HPV vaccine is *not* reliably associated with GBS. Andrews at 1730–31; Gee at 5757–58. The balance of evidence on this topic does not favor Petitioner.

2. *Tdap Vaccine*

There are too many substantive deficiencies in Drs. Bradfute's and Santoro's theories as specifically crafted herein for me to find that the Tdap vaccine has been shown to likely cause GBS. Dr. Bradfute unquestionably placed more emphasis on the HPV vaccine, and Dr. Santoro's generalized views about immune stimulation due to vaccines overall were no more than plausible.

I have also on many prior occasions (as noted above) addressed theories involving the capacity of the Tdap vaccine to cause GBS. I recently addressed at length such a theory in *Kaczerowski*, rejecting it based on the following considerations and findings:

- While there is evidence suggesting that *flu vaccine components* could cause an autoimmune-cross reaction with myelin basic protein sufficient to spark GBS, that evidence cannot be applied in blanket fashion to the Tdap vaccine (or other disparate vaccines for that matter);

- The wild-analogs to the Tdap vaccine components have not been shown to be associated with GBS (for example, a tetanus wild bacterial infection);

- Passive surveillance data or case reports are weak proof of causation, and only demonstrate a naked temporal association with vaccination;

- Existing epidemiologic evidence better supports the conclusion that the Tdap vaccine is not likely associated with GBS; and

- Naked showings of putative amino acid sequential homology between antigens *compared* to tetanus toxin and myelin basic protein-like proteins are speculative and/or insufficient alone to prove an autoimmune cross-reaction between Tdap vaccine and the identified self-antigen is "more likely than not" to lead to GBS.

*See Kaczerowski,* 2025 WL 2798865, at *33–38.

Drs. Bradfute and Santoro made no additional causation arguments that distinguish the opinion offered in this case from what was proposed in *Kaczerowski*, and identified no more recent studies bulwarking the putative vaccine association, while relying on some items of literature (Chang; Yih 2009) also filed in this matter. Respondent, however, referenced herein two epidemiologic studies more directly contradicting the conclusion that the Tdap vaccine is associated with GBS. Tuttle at 2047–48; Baxter at 197. As a result, I have been provided with no evidence in this case that would suggest I should diverge from my determination in *Kaczerowski.* It has not been preponderantly demonstrated that "more likely than not" the Tdap vaccine can cause GBS.

3. *Meningococcal Vaccine*

Petitioner's argument for the meningococcal vaccine as able to trigger his GBS was by far the weakest and least supported of the three vaccines in question. Petitioner's homology findings did not return peptide matches for the meningococcal vaccine. First Bradfute Rep. at 2–4. But even with some sequence matching, proof of similarities between a vaccine's components and those of

some nerve myelin component does not prove the vaccine likely is causal of injury. Dr. Santoro's arguments revolving around the meningococcal vaccine and Petitioner's GBS were more developed, but still lacking. Both experts failed to establish reason to believe that meningococcal bacterial antigens could themselves likely lead to GBS (in comparison to other kinds of bacteria, like *C. jejuni*, that are clearly well-associated). And the experts again relied on passive surveillance data, evidence derived from VAERS databases, and case reports—weak evidence that cannot establish causation by a preponderance of the evidence.

The evidence presented against an association was more robust. The Velentgas article looked at over a million recipients of the meningococcal conjugate vaccine and found no increased risk of GBS. Velentgas at 1355–57. Similarly, the author of Yih 2012 even reported that there were no confirmed cases of post meningococcal vaccine GBS in that surveyed over two million doses of the Menactra (meningococcal) vaccine. Yih 2012 at 1359. Nothing offered in this case was any more convincing or substantiated than the theory I evaluated, but rejected, in *Gatto*.

## CONCLUSION

A Program entitlement award is only appropriate for claims supported by preponderant evidence. Here, Petitioner has not made such a showing. Petitioner is therefore not entitled to compensation.

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court **SHALL ENTER JUDGMENT** in accordance with the terms of this Decision.[24]

**IT IS SO ORDERED**.

/s/ Brian H. Corcoran
Brian H. Corcoran
Chief Special Master

[24] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment if (jointly or separately) they file notices renouncing their right to seek review.